| TOBIAS, Judge.
The defendant, Byron Points, was indicted for the first-degree murder of Linda White. The jury convicted him of manslaughter, a violation of La. R.S. 14:31. The trial court sentenced the defendant to serve forty years at hard labor, with credit for time served. The defendant appeals his conviction and sentence.
Merva Bellazer, the manager of the apartment building at 1908 Wilton Drive, testified that she knew the White family as tenants of the building. On the night of 17 August 1994, Ms. Bellazer awoke to the sound of ten-year-old Lamika White frantically knocking on her front door. As she opened the door, Lamika told her that “Byron shot my mama.” Ms. Bellazer called 911, and then she and her daughter accompanied Lamika to the White residence. As Ms. Bellazer entered the White apartment, she saw that the back door was open, and broken from its hinges. She heard Demetrius White, the victim’s husband, crying and screaming. Upon entering the victim’s bedroom, Ms. Bellazer saw Demetrius White seated on the floor, cradling his unconscious wife in his arms. Ms. Bellazer found twelve-year-old Angel White and four-year-old Demetria White hiding in a bedroom closet. She placed Angel and Demetria in her car with their sister, Lamika, and her daughter, and returned to comfort Demetrius White until medical help arrived.
Demetrius White testified that he and his wife had been married nineteen years at the time of her death, and that they *399 lived at 1908 Wilton Drive with their four daughters, Shadiqua, Angel, Lamika and Demetria. Shadiqua and the ^defendant were married, and had a two-year-old son. However, the couple had separated, and Shadiqua and her child returned to live with her parents. On the night his wife died, Mr. White called her at approximately 10:45 p.m. to tell her he would be working late. Sometime later his daughter, Angel, called to tell him that the defendant shot the victim. He drove home, and found his wife lying on the floor with a gunshot wound to her arm and neck. He placed a pillow under her head, and sat beside her, waiting for help to arrive. Only his daughters Angel and Demetria were home. Shortly thereafter, Ms. Bel-lazer arrived. All the windows and doors of the house were locked, except the kitchen door, which appeared to have been kicked from its hinges.
Mr. White and the defendant had a history of conflict over family matters, including the defendant’s taking his son, and refusing to return the child to its mother; however, their differences never resulted in physical confrontation.
Homicide Detective David Gaines testified that he investigated the homicide at 1908 Wilton Drive. When he arrived at the scene, the victim was already dead. Based on information received at the crime scene, police arrested the defendant, who was carrying a .40 caliber semi-automatic handgun. Police technicians photographed the crime scene and recovered a spent .40 caliber bullet casing.
Officer Mark Delpit testified that on the early morning hours of 17 August 1994 he was investigating a business burglary when he received a dispatch concerning a murder suspect, accompanied by a female, fleeing the scene on a bicycle. Officer Delpit noticed a couple fitting the description given by the dispatcher, and stopped them. The male identified himself as Byron Points. The female, who had an injured lip, gave her name as Shadiqua Points. She explained that the defendant forcefully removed her from her parents’ residence. Officer [¡¡Delpit patted down the male’s clothing, and confiscated a loaded .40 caliber semiautomatic handgun.
Officer Byron Windbush, an expert in analyzing and identifying firearms and ammunition, testified that he test fired the .40 caliber semi-automatic weapon confiscated from the defendant. Comparing the test bullet to the casings retrieved from the crime scene and the bullets recovered during the victim’s autopsy, Officer Windbush concluded that the same .40 caliber weapon fired the casings and bullets.
Dr. Paul McGery, forensic pathologist with the Orleans Parish Coroner’s Office, who autopsied the victim’s body, testified that he determined that the victim suffered a single gunshot, which pierced her wrist and a major artery in her neck, and lodged in her lung. The victim died from massive blood loss, and inability to breathe. Dr. McGery recovered a bullet and bullet jacket from the victim’s body. He also noted that the victim was approximately six and one-half months pregnant when she died. The fetus died with the victim.
Ms. Delores Fisher, Shadiqua White’s godmother, testified that she had intervened in the custody struggle between Shadiqua and the defendant. On an occasion two to three weeks prior to the shooting, Ms. Fisher went to the defendant’s residence, at the request of the victim, to convince the defendant to return the baby to Shadiqua. As she spoke to the defendant, Demetrius White arrived at the defendant’s residence, asking to speak with the defendant. The two men stepped outside to talk. Ms. Fisher heard Demetrius White ask the defendant to return the *400 baby, and work out a visitation plan with Shadiqua. The defendant refused to relinquish the baby. There was no physical altercation between the men; however, they juggled the baby back and forth between themselves. Ultimately, |4the defendant allowed Demetrius White to leave with the baby. After Demetrius White left, the defendant threatened to kill him.
Angel White, the victim’s second daughter, testified that she lived at the Wilton Drive address with her parents and three sisters. On the night of 17 August 1994, she heard the defendant breaking into the apartment. Shadiqua, Angel, Lamika and Demetria ran into their mother’s bedroom. The defendant entered her mother’s bedroom armed with a gun. Angel and Dem-etria ran, and hid in their bedroom closet; Shadiqua and Lamika remained in their mother’s bedroom. As she ran, Angel heard gunshots and her mother scream. When the noise subsided, she returned to her mother’s bedroom, and called her father. Shadiqua and Lamika were gone, and her mother appeared to be dead.
Shadiqua White testified that she lived with her parents and three younger sisters in August 1994. Although she and the defendant were married at the time, they had been separated for a few months. Shortly after midnight, on 17 August 1994, she and the victim were talking in the victim’s bedroom. Her father was not at home, and neither was her baby, only her three younger sisters. Shadiqua received a call from the defendant, and told him the baby was at her cousin’s house. A little while later, she heard the defendant break into the apartment. He proceeded to the victim’s bedroom, and fired one shot. She and her sisters ran from the room. When Shadiqua fell in the living room, the defendant grabbed her, and dragged her from the apartment. The defendant retrieved a bicycle, and the pair rode to the levee. The defendant hit her several times, and forced her to have sex. Afterwards, they rode the bike to the lakefront. The defendant told her that he was going “to get” her father. Eventually, the police stopped them, and confiscated a gun from the defendant.
| ¡¡Calvin Fletcher testified that he had known the defendant since high school, and lived next door to him at the time of the shooting. Two to three weeks prior to the shooting, Fletcher observed Demetrius White force his way into the defendant’s apartment and remove the defendant’s child. The defendant and White argued, and two people on the scene had to restrain White.
The defendant testified that he and Sha-diqua White were married, but separated, at the time of the shooting. The couple had one child, Byron Points, Jr. The defendant related the incident in which Shadi-qua’s father forced his way into his apartment, and physically removed his son from him. When the defendant attempted to take his back, Shadiqua’s father brandished a gun and threatened to kill him. Delores Fisher, Shadiqua’s godmother, witnessed the incident. For two or three weeks following that confrontation, the defendant made numerous requests to see his son, but his estranged wife and her parents refused his requests. On the night of the shooting, the defendant learned from his cousin that Shadiqua and Byron, Jr. were at the White residence. Shadiqua would not allow him to see his son, so he left. About forty-five minutes later, Shadiqua called him at home, and told him that his son was visiting her out-of-town relatives. The defendant returned to the White residence, forced his way through the back door, and encountered Shadiqua speaking to the victim in the victim’s bedroom. Shadiqua and her sisters screamed and ran from the bedroom. *401 As Shadiqua passed him, she hit his arm, causing his gun to fire. She told him that his son was at her grandmother’s house, and offered to accompany the defendant to pick up the child. The defendant and Sha-diqua left the White residence on his bicycle, and rode to the lakefront where they talked about family matters and their marital problems. Shadiqua willingly accompanied him, and then when he told her to go home, she j (¡refused. As he and Shadi-qua rode from the lakefront, the police stopped them, and confiscated his gun.
The State re-called Shadiqua White to the stand. She denied the defendant’s assertions that she hit him, causing the gun to fire. She also disputed his claim that she willingly left the residence with him after the shooting.
ERRORS PATENT
A review of the record reveals no errors patent.
ASSIGNMENT OF ERROR NUMBER 1
In his first assignment, the defendant argues that the evidence is insufficient to support his conviction.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact’s determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989).
[7In this case, although the defendant was charged by grand jury indictment with first-degree murder, the jury convicted him of the responsive verdict of manslaughter, which is defined in La. R.S. 14:31, in part, as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed;
“Sudden passion” and “heat of blood” are not separate elements of the offense but are mitigating factors, which the defendant must establish by a preponderance of the evidence. State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96), 685 So.2d 590.
La. R.S. 14:10(1) defines specific criminal intent as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” “Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant.” State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532.
*402 The defendant does not dispute that his gun fired the fatal bullet. He insists, however, that his conviction cannot stand because the weapon discharged accidentally.
The jury heard evidence of marital problems and familial discord among the defendant, his estranged wife, and the victim’s family. The evidence indicates that shortly before the shooting, the defendant and his estranged wife argued over custody of their child and interfering family members at the White residence. The | sdefendant returned to his apartment, armed himself with a .40 caliber weapon, and returned to the victim’s residence. Several witnesses testified that the defendant forcibly entered the residence by breaking the door, and then proceeded to the victim’s bedroom. The State’s witnesses testified that the defendant stood in the bedroom, and fired the fatal shot with no words spoken until the victim called her husband’s name with her dying breath. Even though the defendant testified the shooting was accidental, the jury chose to disregard the defendant’s account, and instead, credited the testimony of the State’s witnesses. It is not the function of the reviewing court to reevaluate the credibility of witnesses, and then proceed to overturn factual determinations of credibility. State v. Richardson, 425 So.2d 1228, 1232 (La.1983). This assignment is without merit.
ASSIGNMENT OF ERROR NUMBER 2
In a second assignment of error, the defendant claims that a statutory maximum sentence of forty years in his case is not intended to “make [any] measurable contribution of acceptable goals of punishment ... and is grossly out of proportion to the severity of the crime” and should, therefore, be reduced.
A sentence may be reviewed for constitutional excessiveness even though it is within statutory guidelines. State v. Cann, 471 So.2d 701, 703 (La.1985). In reviewing a sentence for exces-siveness, the Court must first determine whether the trial court complied with La. C.Cr.P. art. 894.1 in imposing the sentence and then determine whether the sentence is too severe given the circumstances of the case and the defendant’s background. State v. Lobato, 603 So.2d 739, 751 (La.1992). If the sentence needlessly imposes pain and suffering and is grossly out of proportion to the seriousness of the offense so as to shock our sense of justice, then | nit may be determined to be unconstitutionally excessive as violative of La. Const. Art. 1, § 20 (1974). Id. However, a sentence imposed will not be set aside absent a showing of abuse of the trial court’s wide discretion to sentence within statutory limits. Id.
Once adequate compliance with La.C.Cr.P. art. 894.1 is found, the court may consider whether the sentence is excessive in light of sentences imposed by other courts in similar circumstances. This sentence is not excessive in light of the jurisprudence.
The defendant was charged with first-degree murder, and convicted of manslaughter. The sentencing range for manslaughter under La. R.S. 14:31 is zero to forty years.
The trial court did not order a presen-tence investigation. It was not required to do so. La. C.Cr.P. art. 875; La. R.S. 15:1132.
At the sentencing hearing on May 14, 1996, the court noted:
... it’s the judgment of the Court in this case from the Court’s appreciation of the facts as heard by this Court that this was not an accidental killing, that the defendant intended the violence that he caused. In this Court’s opinion, it *403 was not justified. The actions of the defendant in this case has (sic) deprived a family of its mother, besides the death of a six-and-a-half-month unborn fetus, that the coroner testified to was a normal child. And if that child could have stayed with its mother through a full term he (sic) would have been born. And you deprived that right to life.
Therefore, it’s the judgment of the Court that the defendant be sentenced to be turned over to the custody of the Department of Corrections for the maximum penalty prescribed by this statute, 40 years in the Department of Corrections, less credit for time served, as I stated before. Plus, the Court will allow the defendant good time. The factual basis under Article 894.1(3) — subsection (1A)(3), that a lesser sentence would depreciate (sic) the seriousness of the defendant’s crime in this Court’s opinion.
|]nThe trial court considered the sentencing guidelines under La.C.Cr.P. 894.1 in its reasons for judgment. Its primary reason for imposing the maximum sentence was a sense of shock and outrage at the loss suffered by the victim’s family — the loss of Mrs. White and her unborn child.
While it is true that the defendant is a somewhat youthful first offender, maximum or near maximum sentences for manslaughter convictions have been affirmed in several cases even where the defendant had no prior convictions. In State v. Bowman, 95-0667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, this Court affirmed a thirty-three year manslaughter sentence for a sixteen-year-old first offender who drove the ear but did not pull the trigger in a drive-by shooting. In State v. Black, 28,-100 (La.App. 2 Cir. 2/28/96), 669 So.2d 667, the Second Circuit affirmed a forty year sentence for a twenty year old defendant who pleaded guilty to a reduced charge of manslaughter. Moreover, maximum or near maximum sentences for manslaughter convictions have been affirmed in several cases where the defendant had no prior convictions. Cf. State v. Maxie, 594 So.2d 1072 (La.App. 3 Cir.1992); State v. King, 563 So.2d 449 (La.App. 1 Cir.1990).[1]
The trial court has great discretion in sentencing within statutory limits. State v. Trahan, 425 So.2d 1222 (La.1983). A sentence should not be set aside as excessive in the absence of a manifest abuse of discretion. State v. Washington, 414 So.2d 313 (La.1982). In State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:
On appellate review of sentence, the only relevant question is “ ‘whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.’ ” [Citations omitted]. For legal sentences imposed within the range provided by the legislature, a trial In court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. Art. I, § 20, i.e., when it imposes “punishment disproportionate to the offense.” [Citations omitted]. In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, [citation omitted], a remand for resen-tencing is appropriate only when “there appear[s] to be a substantial possibility that the defendant’s complaints of an *404 excessive sentence ha[ve] merit.” [Citation omitted].

Id.

In this case, the evidence shows that the defendant and his estranged wife argued over visitation rights. The defendant left the scene, armed himself, and returned to continue the confrontation with his in-laws. He kicked open the back door, and without provocation, fired one shot killing the victim, and her unborn child, in front of her four children. The trial court did not abuse its discretion. We find no merit in defendant’s argument that his sentence is excessive.
Accordingly, for the above reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. The maximum sentence at the time these defendants were sentenced was twenty-one years.