MADELEINE M. LANDRIEU, Judge.
|]The defendant, Kedrick Johnson, was convicted of two counts of manslaughter and sentenced as a multiple offender to two consecutive eighty-year terms. For the reasons that follow, we affirm Mr. Johnson’s convictions and sentences.
PROCEEDINGS BELOW
On February 24, 2011, in a multi-count indictment, Kedrick Johnson was charged with violating the Louisiana Street Terrorism Enforcement and Prevention Act, *687 Louisiana Revised Statute 15:1404(B), by engaging in a pattern of criminal gang activity involving four instances of the sale and/or possession of and transportation of controlled dangerous substances during the period of August 17, 2000 through January 9, 2007. The indictment also charged Mr. Johnson with two counts of second-degree murder, violations of Louisiana Revised Statute 14:80.1, relating to the December 1, 2002 shooting death of Jerome Scarborough and the April 2, 2007 shooting death of Alexander Williams. After a jury trial on August 7, 2012 through August 9, 2012, Mr. Johnson was found guilty of two counts of |amanslaughter. The jury declined to find him guilty of the charges arising from the Louisiana Street Terrorism Enforcement and Prevention Act.
After the trial, the State filed a multiple bill of information, pursuant to Louisiana Revised Statute 15:529.1. The trial court adjudicated Mr. Johnson a second-felony offender as to the Scarborough manslaughter conviction and as a third-felony offender as to the Williams manslaughter conviction. Mr. Johnson was sentenced to two consecutive eighty-year sentences. This appeal follows.
ASSIGNMENTS OF ERROR
Mr. Johnson first asserts that the evidence was insufficient to support his manslaughter convictions for the deaths of Mr. Scarborough and Mr. Williams. Intertwined in this assignment of error are Mr. Johnson’s assertions that the trial court abused its discretion in allowing into evidence (1) the statement of Stephen Hymel, an eyewitness to Mr. Williams’ murder, (2) the statement of Joshua Johnson, a witness to Mr. Williams’ murder, and (3) a report from ATF Special Agent Cheryl Harrell. In his final assignment of error, Mr. Johnson asserts that his sentences are excessive under the circumstances of this case.
FACTS

The December 1, 2002 Shooting Death of Jerome Scarborough

On December 1, 2002 at 11:47 p.m., Ms. Arva Lewis called 911 and reported that she had heard gunshots and thought there was possibly a dead body on her back porch. New Orleans Police Department Officer Carolyn Dalton responded to the call and observed the body of a black male, later identified as |3Jerome Scarborough, on Ms. Lewis’ back porch as she had reported. Officer Dalton notified EMS personnel, who pronounced Mr. Scarborough dead on the scene. A fully loaded, unfired, .38 caliber weapon was in Mr. Scarborough’s back pocket.
New Orleans Police Department Homicide Detective Greg Hamilton, the lead investigator in the case, learned that Ms. Lewis and three children, Leonard, Ivan, and Shelby, lived at the St. Claude Avenue residence and were present when the shooting occurred. Ms. Lewis, Ivan, and Shelby were transported to the homicide office, where they gave statements about the events leading to the shooting. Based on the statements, Detective Hamilton obtained arrest warrants for Leonard Lewis and his friend, Kedrick Johnson, the defendant in this appeal. Both men were arrested and charged with the second-degree murder of Mr. Scarborough.[1] The facts giving rise to the defendant’s arrest and conviction will be addressed later in this opinion.

*688
The April 2, 2007 Shooting Death of Alexander Williams

On April 2, 2007, Sergeant John Blatcher of the New Orleans Police Department investigated a 911 call reporting a shooting in the 1200 block of Louisa Street. When he arrived on the scene, a black male, later identified as Alexander Williams, was lying face up near the driver’s side door of a black Taurus parked in front of 1220 Louisa Street. Mr. Williams was unresponsive and |4had suffered an apparent gunshot wound to the back of his head. EMS personnel transported Mr. Williams to the hospital, where he was later pronounced dead.
ATF Special Agent Cheryl Harrell, assigned to New Orleans to investigate street gangs, narcotics offenses, and federal firearms violations, participated in the investigation of the homicide of Mr. Williams. During her investigation, she learned that Mr. Williams had received a call from a man named Joshua Johnson seven minutes before the first 911 call reporting the shooting.[2] Agent Harrell met with Mr. Johnson twice. She first met with him at a federal prison in Yazoo City, Mississippi and later met with him at his attorney’s office in New Orleans in 2009. In the latter meeting, Agent Harrell was accompanied by Detective Michael McCleary.
At this second meeting, Mr. Johnson revealed that he was inside 1220 Louisa Street cooking cocaine on the day Mr. Williams was shot. Prior to the shooting, he observed Mr. Williams in the area trying to buy narcotics from the defendant. According to Mr. Johnson’s statement to Agent Harrell, Mr. Johnson observed the defendant and Mr. Williams argue over the price of the drugs and then observed Mr. Williams leave the area. Shortly thereafter, an acquaintance told Mr. Johnson that he had heard that Mr. Williams had a gun in his car and was looking for the defendant. Soon thereafter, Mr. Johnson heard gunshots. When he Hooked out of his window, he saw Mr. Williams lying on the ground and saw the defendant holding a gun.
ERRORS PATENT
A review of the record for errors patent reveals none.
DISCUSSION
I. Sufficiency of the Evidence
In his first assignment of error, the defendant contends that the State presented insufficient evidence to support his two manslaughter convictions beyond a reasonable doubt. When reviewing for the sufficiency of the evidence, this court is controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Id. at 319, 99 S.Ct. 2781. As stated by the Louisiana Supreme Court in State v. Mussall, 523 So.2d 1305, 1311 (La.1988):
If the court finds that no rational trier of fact viewing all of the evidence from a rational pro-prosecution standpoint could have found guilt beyond a reasonable doubt, the conviction cannot stand constitutionally. The actual trier of fact’s rational credibility calls, evidence weighing and inference drawing are preserved through the requirement that upon judicial review all of the evidence *689 is to be considered as if by a rational fact finder in the light most favorable to the prosecution, and by the admonition that the sufficiency inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Thus, the reviewing court is not called upon to decide whethér it believes the witnesses or whether the conviction is contrary to the weight of the evidence. As Professor Wright observes, the important points are that “the court is not to substitute its judgment of what the verdict should be for that of the jury, but that at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have .a reasonable doubt.” [Footnotes and citation omitted.]
| fiIn this case, Mr. Johnson was convicted of two counts of manslaughter under Louisiana Revised Statute 14:31(A)(1), which defines manslaughter as
... a homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. • .
“Sudden passion” and “heat of blood” are mitigating factors, which the defendant must prove beyond a preponderance of the evidence, not separate elements of the offense. State v. Points, 2000-1371, p. 7 (La.App. 4 Cir. 4/11/01), 787 So.2d 396, 401. The jury may infer the mitigatory circumstances from the evidence. State v. Cheavious, 2003-0706, p. 8 (La.App. 4 Cir. 11/19/03), 862 So.2d 135, 140. Manslaughter, under the theory of “sudden passion” or “heat of blood,” like second-degree murder, requires proof of the defendant’s specific intent to kill or cause great bodily harm. State v. Harris, 2000-3459, p. 10 (La.2/26/02), 812 So.2d 612, 618. Specific intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the • prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). “Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant.” State v. Bishop, 2001-2548, p. 4 (La.1/14/03), 835 So.2d 434, 437 (Citations omitted). If, however, the evidence adduced at trial is sufficient to support a conviction for the charged offense of second-degree murder, then the jury’s verdict 17of manslaughter is authorized. State v. Harris, 97-2903, p. 8 (La.App. 4 Cir. 9/1/99), 742 So.2d 997, 1001.

Jerome Scarborough Manslaughter Conviction

The defendant contends that there was insufficient evidence to support a conviction of manslaughter for the death of Mr. Scarborough because only one witness testified that he actually saw him shoot Mr. Scarborough. This argument is without merit.
First, the testimony of one witness, if reasonably credible and believed by the jury is sufficient to sustain a conviction. A victim’s or witness’s testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency. State v. Davis, 2002-1043, p. 3 (La.6/27/03), 848 So.2d 557, 559. In the absence of internal contradiction or irreconcilable conflict with the physical evi *690 dence, one witness’s testimony, is believed by the fact finder, is sufficient support for the requisite factual conclusion. State v. Dorsey, 2010-0216, (La.9/7/11), 74 So.3d 603, 534 (citing State v. Robinson, 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79.) Second, the State did not have to prove Mr. Johnson was the shooter in order to support his conviction.
The defendant was charged as a principle in the death of Mr. Scarborough. Principals, as defined in Louisiana Revised Statute 14:24, are “all persons concerned in the commission of the crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its ^commission, or directly or indirectly counsel or procure another to commit the crime.” Principals are considered “equally culpable” for the crime, even if they do not personally commit the acts of the charged offense. State v. Neal, 2000-0674, p. 12 (La.6/29/01), 796 So.2d 649, 659. Evidence that the defendant “acted in concert to bring about'a lethal result [he] specifically intended” suffices to meet the State’s burden. State v. Anderson, 97-1301, p. 1 (La.2/6/98), 707 So.2d 1223, 1224. A review of the record shows that the State’s position at all stages of the trial was that Leonard Lewis was the shooter and the defendant was present and acted in concert with Leonard Lewis. This position is amply supported by the evidence.
Ms. Arva Lewis testified at trial that at about 11:00 p.m. on the night of the shooting, she was at home with Leonard, Ivan, and Shelby. The defendant was at the residence visiting Leonard. From her bedroom, Ms. Lewis heard someone knocking loudly on the front door of the house. She told Ivan to tell the person knocking to go to the back door. Ms. Lewis then heard a gunshot coming from the back of the house. She walked to the rear of the house and saw the defendant holding a gun, complaining that it had jammed. Ms. Lewis testified that the defendant unjammed the gun and told Leonard, Let’s go back to the back door and shoot him again. She tried to restrain Leonard, but he ran to the rear door with the defendant. Ms. Lewis heard two more shots, and although she testified that she did not see who shot the gun, she again saw that the defendant had the gun in his hand. Ms. Lewis testified that the defendant said to her, “Call the police and |flsay someone got shot on your back porch.” The defendant and Leonard then ran out of the house through the front door. Ms. Lewis testified that she had given a statement to police officers on the night of the shooting and had identified photos of her son, Leonard, and the defendant. Upon further questioning, Ms. Lewis admitted that she told Detective Hamilton on the night of the murder that her son, Leonard, is the one who shot Mr. Scarborough. She further testified that she told Detective Hamilton that Mr. Scarborough had come to her house that night to kill Leonard.
Shelby Lewis, Leonard’s sister, testified at trial that she was at home on St. Claude Avenue with her mother and her brother, Ivan, the night of the shooting. Sometime during the evening, her brother, Leonard, and the defendant came to the house. Shelby testified that she was in the bathroom when she heard a loud knock on their front door. She heard the defendant and Leonard speaking with Mr. Scarborough, and then heard two gunshots. She then heard Leonard and the defendant complain that the gun had jammed, after which she heard another gunshot. After she came out of the bathroom, Shelby saw Leonard and the defendant run out of the house through the front door while telling her mother to call the police and report a shooting. Shelby testified that she did not *691 see who actually shot the gun. She testified that she had given a statement to the detectives at the police station on the night of the shooting.
Ivan Lewis, Leonard’s brother, gave a recorded statement to Detective Hamilton on the night of the shooting. At the time of trial, Ivan’s whereabouts 1 inwere unknown. Over a defense objection, the State called Detective Hamilton to the stand to testify regarding Ivan’s statement so. that the statement could be played for the jury.[3] According to the statement, Ivan said that he had heard Mr. Scarborough knocking at the front door at approximately 11:47 p.m. Ivan told Mr. Scarborough to go to the back door, at which time Leonard and the defendant came in and appeared to be scared that something would happen to Leonard. Ivan heard an exchange of words between the three men, and then saw Leonard shoot the victim one time. Ivan stated that he heard the defendant tell Leonard to “finish him [Mr. Scarborough] off.” Leonard then shot Mr. Scarborough three more times. The defendant and Leonard ran out of the house through the front door. They told Ivan and his family to call the police and make up a story about the shooting.
The defense called Leonard Lewis to the stand, who testified that he was incarcerated at the time of the trial after having pled guilty to manslaughter in the death of Mr. Scarborough. He testified that he had received a plea deal in exchange for his testimony against the defendant and that his sentence would be based on the truthfulness of his testimony. Leonard recalled that on the night of the shooting, he, Mr. Scarborough, and the defendant were playing dice on his mother’s back porch. Mr. Scarborough and the defendant got into a physical altercation over the game, and the defendant knocked Mr. Scarborough down to the ground. Then, the defendant shot Mr. Scarborough. Leonard testified that the gun jammed after the first shot, so the defendant told him to get a kitchen knife and finish him (Mr. ^Scarborough) off. Leonard testified that the defendant then somehow unjammed the gun and shot Mr. Scarborough five or six more times. Leonard testified that his only involvement in the shooting was disposing of the gun.
Although the witnesses’ testimony varied as to who actually shot the gun, all four witnesses testified that the defendant was present and participated in the killing of Mr. Scarborough. Viewing the entire record in the light most favorable to the prosecution, any rational trier of fact could have found, beyond a reasonable doubt, that Mr. Johnson was a principal, and that the State proved all the elements of manslaughter beyond a reasonable doubt. This assignment of error is without merit. Alexander Williams Homicide
The defendant contends that the State presented insufficient evidence to prove beyond a reasonable doubt that he killed Mr. Williams. He argues that the State did not present a single witness at trial who claimed to have seen him shoot Mr. Williams, but, rather, based its entire case on hearsay evidence. “[W]hen the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial.” State v. Hearold, 603 So.2d 731, 734 (La.1992). Thus, we first consider whether the entirety of *692 the evidence is sufficient to support the conviction.
| ^Detective Michael McCleary testified that in connection with the investigation of the Williams homicide, he met with an alleged eyewitness, Mr. Stephen Hymel.[4] According to Detective McCleary, Mr. Hy-mel told him that he knew the defendant because they had been neighbors for a number of years. Mr. Hymel also told Detective McCleary that on the day of the shooting, he was working around his house when he saw the defendant run from an alley and shoot Mr. Williams. Mr. Hymel stated that he was in his living room and saw the shooting from his front window. He stated that he saw the defendant fire three or four shots. The State introduced into evidence Mr. Hymel’s recorded statement which corroborated Detective McCleary’s trial testimony.
The State also introduced into evidence a statement Joshua Johnson gave to ATF Agent Harrell and Detective McCleary. In this statement, Joshua Johnson said that he heard gunshots, saw Mr. Williams’ body on the ground, and saw the defendant standing above Mr. Williams holding a gun.
The defendant presented the testimony of Dominique Morgan, who lived in the same neighborhood as Mr. Hymel and the defendant. She testified that she knew Mr. Hymel as “Crack Head Steve” and that the general knowledge in the neighborhood was that he used crack cocaine. She stated that Mr. Hymel’s house was known to be a crack house where people would go to discuss drug transactions.
| isThe factfinder’s determination of credibility should not be overturned unless there is no evidence to support those findings. State v. Bourque, 622 So.2d 198, 222 (La.1993). We find that the jury did not abuse its discretion in accepting as true the statements of Mr. Hymel and Joshua Johnson. Because these statements were sufficient to convict the defendant of the manslaughter of Mr. Williams, this assignment of error is without merit.
We next address the defendant’s arguments that the statements of Mr. Hy-mel and Joshua Johnson, as well as Agent Harrell’s ATF report, were inadmissible. If these hearsay statements were properly admitted, the conviction will stand; if the hearsay statements were inadmissible and not harmless error, the conviction must be reversed and a new trial ordered. See, Hearold, 603 So.2d at 738.
II. Stephen Hymel’s Statement
Mr. Hymel was killed after he gave a recorded statement to the police about this crime and before this case proceeded to trial. In this assignment of error, the defendant asserts that his Sixth Amendment right of confrontation was violated when the trial court allowed Detective McCleary to testify about what Mr. Hymel had told him and admitted into evidence Mr. Hymel’s recorded statement.
The Sixth Amendment’s confrontation clause provides that, “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const. Amend. VI. In Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Sixth Amendment’s confrontation clause bars admission of an uncross-examined “testimonial” statement that an unavailable witness previously 114made out of court. While the Crawford Court did not *693 fully define “testimonial,” the Court recognized that the Confrontation Clause applies to “witnesses against the accused in other words, those who bear testimony.... An accuser who makes a formal statement to government officers bears testimony in a sense that a casual person who makes a casual remark to an acquaintance does not.” Crawford, 541 U.S. at 51, 124 S.Ct. 1354. Simultaneously, the Crawford Court discussed certain exceptions to the right of confrontation. At issue here is the recognized exception referred to as “forfeiture by wrongdoing.”
It is undisputed that Mr. Hymel’s statement to the police officers is “testimonial.” Therefore, its admissibility hinges on whether the “forfeiture by wrongdoing” exception applies under the facts presented here.
Forfeiture by wrongdoing was first addressed by the United States Supreme Court in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878 Term). The Reynolds Court stated:
The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot' complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.
Id. at 158.
The United States Supreme Court more recently examined the “forfeiture by wrongdoing” exception in Giles v. California, 554 U.S. 353, 367, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), and found that the exception “applies only if the defendant has in mind the particular purpose of making the witness unavailable.” In Giles, the defendant was | lson trial for the murder of his girlfriend. The State of California introduced statements that had been made by the girlfriend to police officers responding to a domestic violence report three weeks prior to the shooting. Over the defense’s objection, the trial court admitted the statements, and the defendant was ultimately found guilty. On appeal, the defendant asserted that the admission of the victim’s statements had violated his Sixth Amendment right of confrontation. The California Court of Appeal held that the Confrontation Clause was not violated, finding that Mr. Giles had forfeited his right of confrontation because his killing of his girlfriend was an intentional criminal act that had made her unavailable to testify. The California Supreme Court affirmed on the same grounds. The United States Supreme Court granted certiorari and refused to extend the “forfeiture by wrongdoing” exception to the facts in Giles. The Court held that in order to admit testimonial hearsay evidence that would fit within the forfeiture by wrongdoing exception, the prosecution must show that the defendant had intended to prevent a witness from testifying. Id. at 361, 128 S.Ct. 2678.
Louisiana’s forfeiture by wrongdoing exception was modeled after the Federal Rule and is firmly rooted in a hearsay exception. We recently discussed this exception in State v. Warner, 2012-0085, pp. 12-19 (La.App. 4 Cir. 5/1/13), 116 So.3d 811, 817-821. Louisiana Code of Evidence article 804(B)(7)(a) provides that “[a] statement offered against a party that has en *694 gaged or acquiesced in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness” is not excluded by the hearsay rule. The party seeking to introduce the statement must establish by a preponderance of evidence that the party against whom the statement is offered engaged in or acquiesced in the wrongdoing. La. C.E. art. 804(B)(7)(b).
1inHere, the State introduced evidence that Mr. Hymel gave a statement to Detective McCleary in which he said that he saw the defendant shoot Mr. Williams. Detective McCleary testified that Mr. Hy-mel feared retaliation so they listed him as a “known witness” in police reports and that his name was redacted from his statement.[5] On April 29, 2009, at a hearing on the defense’s motion to suppress an identification, the defense complained that they did not know the identity of the “known witness.” During the hearing, the State provided the defense with a photograph of the man Mr. Hymel had identified as the shooter. This was a photograph of the defendant. The State did not initially realize it, but Mr. Hymel’s name and signature were on the back of that photograph. Mr. Hymel was killed later that day.
In support of its theory that the defendant was responsible for Mr. Hymel’s death, the State identified and played for the jury two telephone calls made by the defendant on April 29, 2009. This is the same day Mr. Hymel’s identity was made known to the defense. The referenced calls were placed by the defendant after the hearing and before Mr. Hymel was shot and killed later that evening.[6]
The first call was made by the defendant to his father. In that phone call, the defendant’s father said to him, “... so if it’s this person who we think ... the detective say he working for the city for three years ... and he said this person said they were sitting in their living room.... ” The defendant replied, “I read the transcript ... and [the police] ask him, ‘information you gave to us today, would you be willing to come to court ... [the witness] said ... no, I wouldn’t ... when they did the computers on the person ... the person having multiple arrests ... the person ain’t li7gonna want to deal with it.” The second call was placed by the defendant a few hours later to an associate. In the recording of that call, the defendant is heard to say: “So by 9 o’clock I should be on with it ... I know one thing, you should’ve you probably done f* * * *d that hoe by then ... Let me know if it’s good tonight or in the morning with that hoe when I calls.” Mr. Hymel was killed at approximately 10:00 that evening.
The defendant argues that Stuart Weg, his attorney at the time of the motion hearing, had informed him of Mr. Hymel’s identity months before Mr. Hymel’s death.[7] However, this representation is contradicted by the transcript of the April 29, 2009, during which Mr. Weg requested a continuance because he did not know the identity of a “known witness.” When asked by the court who this witness was, Mr. Weg responded “I don’t know. That’s *695 why they are unidentified.” After being shown the identification photograph on which Mr. Hymel had signed his name, Mr. Weg stated, “Now I know the name of the alleged identification individual.”
We find that the State established by a preponderance of evidence, as provided in Louisiana Code of Evidence article 804(B)(7)(b), that the defendant procured or acquiesced in the murder of Mr. Hymel, thereby making him unavailable to testify. As such, the trial judge did not err in ruling that Mr. Hymel’s statement was admissible under the forfeiture by wrongdoing exception to the hearsay rule. This assignment of error is without merit.
III. Joshua Johnson’s Statement
118In this assignment of error, the defendant claims that his Sixth Amendment right of confrontation was violated when the trial court allowed the State to introduce the prior testimony of Joshua Johnson.
Prior to this trial, the defendant had already been tried for the murder of Mr. Williams. That trial resulted in a hung jury. During that trial, the State called Joshua Johnson to the stand. In the proceedings before us, the trial court, over a defense objection, allowed the State to introduce that prior sworn testimony into evidence finding that Mr. Johnson was “unavailable.”
Louisiana Code of Evidence article 804(A) provides that “a declarant is ‘unavailable as a witness’ when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court.” This includes when the declarant is “absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means.” When a witness has been declared “unavailable,” a party may offer “[tjestimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.” La. C.E. art. 804(B)(1).
Determining the unavailability of a witness is a preliminary question for the trial court. La. C.E. art. 104(A). A trial court’s ruling as to a witness’s availability may not be disturbed on appeal absent an abuse of discretion. State v. Ball, 2000-2277, p. 26 (La.1/25/02), 824 So.2d 1089, 1112. Even when the witness is | ^determined to be unavailable, the use of the prior testimony must not violate the defendant’s right to confrontation under the Sixth Amendment. See State v. Hills, 379 So.2d 740, 743-44 (La.1980); State v. Pearson, 336 So.2d 833, 835 (La.1976). It is well settled that, in order to protect this constitutional right, certain conditions must be met before allowing the prior testimony to be introduced into evidence in the present trial:
(1) the defendant must have been represented by counsel at the earlier hearing; (2) the witness must have testified under oath; (3) the witness must have been cross-examined or there must have been a valid waiver of the right to cross-examination; (4) at the time of the trial, the witness must be “unavailable” to testify; and (5) the State must have made a good faith effort to locate the unavailable witness.
Ball, 2000-2277, p. 26, 824 So.2d at 1112 (citation omitted). The record is clear that the defendant was represented by counsel in the previous trial, that Joshua Johnson testified under oath, and that he was cross-examined by defense counsel.
In the instant case, the trial court held a hearing on May 14, 2012, on the *696 State’s motion to introduce the prior testimony of Mr. Johnson. At the hearing, Mike Jurina, an agent for the Orleans Parish District Attorney’s Office, testified that he attempted to execute a State writ of habeas corpus on Mr. Johnson, but was unsuccessful in transporting him to New Orleans from the custody of the Bureau of Prisons in Cumberland, Maryland. When Agent Jurina arrived at the federal prison on April 22, 2012, the prison was on lock-down, and he was told that Mr. Johnson was being non-compliant and argumentative. He testified that there was concern with regard to the ability to transport Mr. Johnson via airplane to New Orleans because he had the potential of becoming very aggressive. At the hearing, the j 2pState asked the trial court to take judicial notice of Mr. Johnson’s behavior during the previous trial for the murder of Mr. Williams. Specifically, the court noted that Mr. Johnson had to be forcefully removed by sheriffs deputies from the vehicle to the courtroom, on the court’s order, because of his hostile demeanor while on the stand and after testifying.
The trial judge, in finding Mr. Johnson to be “unavailable,” and, thus, granting the State’s Article 804 motion, stated that
In my thirteen plus years on the bench I have never had to sign an order [to bring a witness into court] that says “by any means necessary,” which is what the sheriffs department required. They required the Court to sign an order that the defendant — excuse me, that the inmate, Joshua Johnson, be brought to Section “H” by any means necessary because Mr. Johnson was clearly not going to get out of the car even though he was handcuffed and I believe shackled, with leg shackles on.
The Court had to execute the order as we were in a jury trial for Mr. Kendrick Johnson. Mr. Joshua Johnson’s testimony was necessary. The Court notes for the record that once the order was signed, the sheriffs deputies were able to get Mr. Joshua Johnson to come into the courthouse but he refused to come into the court for the trial, that he was in the back by chambers and there were .several sheriffs deputies, Mr. Jurina, I believe a public defender for Mr. Joshua Johnson, and it was a very bad situation in terms of Mr. Joshua Johnson was not going to walk out of that door and take the witness state (sic). And then when he did walk out of the door, we didn’t know what was going to happen, either side, once he hit the witness stand.
Agent Jurina’s testimony today regarding his April 22, 2012, visit to the Cumberland Federal Bureau of Prisons and his conversation with Mr. Joshua Johnson further solidified, in this court’s opinion, that Mr. Joshua Johnson is not and will not go or make himself amendable to going with a transportation agency and/or an agent of the State to effect his transportation here fo court to testify a second time in this trial.
The Court finds that the State has established grounds that would render any order of this Court that he be brought here, render a |21 situation both unsafe for those who would be charged with escorting Mr. Joshua Johnson here to New Orleans and would present a dangerous situation, in fact, for the de-clarant himself, Mr. Joshua Johnson, as this Court had the opportunity to firsthand observe the interaction between Joshua Johnson and the sheriffs deputies and Agent Jurina before he testified in the last trial in November of 2011.
The trial court found that the State had made a good faith effort to make the witness available to testify, but ultimately had been unsuccessful. We cannot say that the trial court abused its discretion in find *697 ing Mr. Johnson to be “unavailable”. Furthermore, the conditions necessary to protect the defendant’s right to confrontation have been met. This assignment of error is without merit.
IV. ATF Special Agent Cheryl Harrell’s report
The defendant next contends that the trial court violated his right of confrontation by allowing the State to introduce Agent Cheryl Harrell’s report into evidence.
Louisiana Code of Evidence article 80S(8)(b)(i) provides that except as specifically provided otherwise by legislation, “[ijnvestigative reports by police and other law enforcement personnel” are inadmissible. The trial court erred when it denied the defense’s objection to the admissibility of this report. We must then address whether this error is harmless.
Confrontation Clause violations are subject to a harmless error analysis. State v. Welch, 1999-1288, p. 6 (La.4/11/00) 760 So.2d 317, 321. The admission of hearsay testimony “is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial.” State v. Johnson, 389 So.2d 1302, 1306 (La.1980). “The verdict may stand if the reviewing court determines l^that the guilty verdict rendered in the particular trial is surely unattributable to the error.” State v. Broadway, 96-2659, p. 24, (La.10/19/99), 753 So.2d 801, 817 (citation omitted).
Agent Harrell’s report contains information she and Detective McCleary received from Joshua Johnson. Had Agent Harrell’s report been excluded from evidence, the jury would have still heard the pertinent contents of the report during Agent Harrell’s and Detective McCleary’s testimonies and in the eyewitness account by Mr. Hymel. We find that the admission of the report was error, but that the report was cumulative and that its admission was, therefore, harmless. This assignment of error is without merit.
Y. Excessiveness of Sentence
In his final assignment of error, the defendant asserts that two consecutive eighty-year sentences, the maximum term of imprisonment he could have received as a multiple offender, are excessive under the circumstances. This issue has not been preserved for appeal. A review of the record indicates that no oral or written motion to reconsider the sentence was filed by Mr. Johnson. Accordingly, he has waived any right to review the sentence on appeal or post-conviction pursuant to Louisiana Code of Criminal Procedure article 881.1(E).[8]
^Nevertheless, we note that the trial judge has the broad discretion in imposition of sentences within statutory limits, but shall, pursuant to Louisiana Code of Criminal Procedure article 894.1(C), “state for the record the considerations taken into account and the factual basis therefor in imposing sentence.” Although rigid compliance with article 894.1 has been deemed unnecessary where the record clearly shows an adequate factual basis for the sentence imposed, the record should reflect the considerations taken into account by the trial court in determining the sentence to aid the reviewing court in *698 determining whether the sentence is warranted in light of the particular circumstances of the case. State v. Quebedeaux, 424 So.2d 1009 (La.1982).
A review of the record shows that at the multiple bill hearing, the trial court reviewed the information in the Pre-Sen-tencing Investigation report. That report revealed that Mr. Johnson had a criminal history dating from 1997. In support of the sentences imposed, the trial judge cited the sentencing guidelines in Louisiana Code of Criminal Procedure article 894.1. In sentencing Mr. Johnson to two consecutive eighty year sentences, the trial judge stated,
The Court finds the fact of the aggravated factors that the code set out that the offender knew the victim, Jerome Scarborough, was fifteen years old at the time he was shot and killed and left to die on the back porch.
That the offender used his position of status to facilitate the commission of the offense. The offender used threats of or actual violence in the commission of the offense.
That the offense resulted in significant permanent injury or significant economic loss to the victim or his family.
That the offender used a dangerous weapon in the commission of the offense.
| g4That the offender was persistently involved in similar offenses not already considered as criminal history or as a part of a multiple offender adjudication.
And that the offender was a leader or his violation was in concert with one or more persons with respect to whom the offender occupied a position of organizer, a supervisory position or any other position or management in terms of the criminal street gang activity that the Court heard about.
The Court finds most chilling in all of this the fact that the sole eyewitness to a murder, that being a witness, Mr. Hymel, for the Alexander Williams murder. That being count two. That the day of these motions to suppress identification were heard in this very courtroom and that that witness’s identification was made public in open court. That that evening, not less than three or four hours later, Mr. Hymel was gunned down on the streets with his murder still remaining a mystery or unsolved by the New Orleans Police Department.
The trial court’s reasons for the sentences more than adequately support the appropriateness and constitutionality of the sentences imposed. Therefore, even if preserved for appeal, this assignment would have no merit.
CONCLUSION
For the foregoing reasons, the defendant’s convictions and sentences are affirmed.
AFFIRMED.
JENKINS, J., concurs in result.

. Leonard Lewis ultimately pled guilty to a reduced charge of manslaughter and was sentenced to five years at hard labor.

. There is nothing in record to suggest that this witness, Joshua Johnson, is related to the defendant, Kedrick Johnson. For clarity, we will refer to Joshua Johnson as Mr. Johnson and to Kedrick Johnson as the defendant.

. The defendant does not appeal the trial court’s ruling on the admissibility of this statement.

. Mr. Hymel did not testify at any motion hearing or at trial. The admissibility of his recorded statement is one of the assignments of error raised by the defendant and will be discussed later in this opinion.

. The defendant did not object to this evidence being heard by the jury.

. A transcript of the calls was also introduced into evidence.

. Mr. Weg testified at Mr. Johnson’s first trial for the murder of Mr. Williams. His previous testimony was read for the jury. On November 17, 2011, he testified that he had received the transcription of a “known witness” statement on January 21, 2009, and he had passed it on to Mr. Johnson at that time. Mr. Weg acknowledged that the transcript had contained blacked out portions, but testified that he had not initially noticed that in one place on the first page of the statement, Mr. Hy-mel's name was not blacked out.

. Louisiana Code of Criminal Procedure article 881.1(E) states in pertinent part:
Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence ... on appeal or review.