MARC E. JOHNSON, Judge.
l2Pefendant, Chasity Griffin, appeals her convictions and sentences for second degree murder, possession of a firearm by a convicted felon, and conspiracy to commit obstruction of justice, raising several issues including sufficiency of the evidence, admissibility of an officer’s testimony on expert matters, and admissibility of hearsay testimony of a deceased witness. For the reasons that follow, we affirm Defendant’s convictions and sentences and remand the matter for the correction of the commitment.
Defendant Griffin, along with her co-defendants Quentin McClure and Jeffrey Nelson, were charged in an eight-count indictment on February 2, 2012 with various crimes relating to the murders of Theodore Pierce and eyewitness Charles Smith. Defendant was charged with the January 2, 2011 second degree murder of Pierce, in violation of La. R.S. 14:30.1 (count one); possession of a | sfirearm by a convicted felon, in violation of La. R.S. 14:95.1 (count five); and conspiracy to commit obstruction of justice, in violation of La. R.S. 14:26 and 14:130.1(A)(2) and/or (A)(3) (count eight).[1] Defendant pleaded *477 not guilty and filed several pre-trial motions.
Defendant filed motions to suppress evidence, identification, and statements, which were heard and denied on November 28, 2011. On October 4, 2011 and November 28, 2011, hearings were held on the State’s motion for admission of witness’ statements pursuant to La. C.E. art. 804(B)(7)(a). The trial court denied the State’s motion on December 12, 2011, finding the State had not met its burden of proof. On January 26, 2012, pursuant to the State’s motion for reconsideration, the trial court reexamined its prior ruling and based on the additional evidence presented, vacated its original ruling. The trial court ordered the statement of the deceased, Charles Smith, admissible for use at trial.
Defendant, and her two co-defendants, proceeded to trial on August 5, 2013 before a twelve-person jury. After an eight-day trial, the jury returned a verdict of guilty as charged against Defendant on all three counts. On September 12, 2013, Defendant filed a motion for new trial, which was heard and denied prior to Defendant’s sentencing on September 19, 2013. The trial court subsequently sentenced Defendant to concurrent sentences of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on count one (second degree murder); 20 years at hard labor without benefit of probation, parole, or suspension of sentence on count five (felon in possession of a firearm); and 30 years at hard labor on count eight (conspiracy to commit obstruction of justice).

J¿FACTS

In summary, Theodore Pierce was murdered outside of a friend’s house in Bridge City on January 2, 2011. Defendant and co-defendant McClure were arrested shortly thereafter and charged with his murder. Pierce’s murder was witnessed by Charles Smith, a neighbor. On August 17, 2011, Smith was found shot to death in front of his home located at 281 Fourth Street in Bridge City. It was alleged that Defendant and McClure conspired with co-defendant Nelson, who is McClure’s younger brother, to murder Smith.

The Murder of Theodore Pierce

At approximately 4:41 p.m. on January 2, 2011, Detective Travis Eserman with the Jefferson Parish Sheriffs Office (JPSO) responded to the scene of a homicide located at 235 Fourth St. in Bridge City involving a victim by the name of Theodore Pierce.[2] Upon his arrival, Det. Eserman observed Pierce’s body in the driveway on the passenger side of a pickup truck. Pierce died on the scene. An autopsy revealed that Pierce died of multiple gunshot wounds to his face, neck and back. Fifteen spent casings were recovered at the scene. Two experts in firearm and toolmark examination, Jene Rauch and Colonel Timothy Scanlan, analyzed the ballistics material recovered from the scene and opined four guns — two .40 caliber pistols and two 9 mm pistols — were used at the scene. Colonel Scanlan, who was also qualified as an expert in crime scene reconstruction, opined there were four shooters shooting at one person from separate locations. The murder weapons were never recovered.
*478 During the investigation, police received an anonymous tip identifying four people, including Defendant and McClure, as being involved in the shooting. | ¡While canvassing the neighborhood for witnesses, police interviewed Charles Smith who lived next door to the murder scene. Smith stated that he witnessed the shooting of Pierce, whom he described as a childhood Mend, and subsequently identified Defendant and McClure in photographic lineups as two of the individuals involved in the shooting.[3] In a taped statement, Smith explained that he witnessed McClure and Defendant, who he occasionally saw walking around the neighborhood, shoot at Pierce while they were standing in front of a neighbor’s house located at 301 Fourth St.[4] Smith stated that the duo were initially standing in the street and then made their way into the yard while they shot at Pierce. He then observed McClure approach Pierce and “finish him off.” Smith further stated that he saw a second male on the scene at the time of the shooting but did not see his face or notice whether he had a gun. Smith confirmed that Pierce did not have a gun and was not shooting back at Defendant or McClure.
Smith also told police during his statement that the day after the shooting, McClure drove to his house armed with a gun and confronted him stating, “I heard you talking about, about the, the shooting,” to which Smith responded that he had not been talking about anything. Smith stated that he believed his life was in danger because he had witnessed the murder.
After Smith’s statement and identifications, arrest warrants were prepared for Defendant and McClure. McClure was subsequently arrested a few blocks from the shooting at his residence located at 313 Lafitte St. A .38 caliber revolver was seized from his residence; however, testing revealed that it was not used in connection with Pierce’s murder. After his arrest and after being advised of his | Miranda[5] rights, McClure gave a taped statement to police explaining that he was home watching the Saints football game on the day of the murder. He stated that after the football game, around 3:00 or 4:00 p.m., he went to his girlfriend, Jocelyn Scott’s, house in Kenner. When asked why someone would want to implicate him in Pierce’s murder, McClure stated that his friend, Reginald Lewis, had been murdered in the same neighborhood in July 2010, and that it was suspected that Pierce killed Lewis.[6],[7]
Several days later, Defendant was arrested at her sister’s home in St. Rose.[8] She likewise provided a taped statement to police after her arrest and after being advised of her rights. In her statement, Defendant stated she had been with an acquaintance named “Christy” in Algiers *479 at the time of the murder. She indicated that she had met Christy the night before the murder at a nightclub, had entered Christy’s phone number into her phone, and had exchanged text messages with Christy on the day of the murder. However, there was no phone number for or text messages to or from Christy found on Defendant’s phone, and police were unable to confirm Christy’s existence.
Records for Defendant’s and McClure’s cell phones showed that they were both in the area of Pierce’s murder at the time he was shot and they left the area minutes after his murder. The cell phone records further indicated that Defendant and McClure exchanged phone calls in the minutes leading up to Pierce’s murder and then again four or five hours after the murder.[9]
|7At trial, McClure presented testimony from his sister, Lekisha Nelson, and Nelson’s girlfriend, Oraneisha Brown, who stated that McClure was home with them at 313 Lafitte St. watching the Saints game at the time Pierce was killed. Both testified that they learned of Pierce’s murder when Nelson’s cousin came to the house around 4:30 p.m. and told them someone had been killed, and that McClure was among the people who had gathered outside in front of their house.
Defendant testified in her defense and testified that she was with a female acquaintance at the time of Pierce’s murder. Defendant explained that she had given her cell phone to her brother prior to going to the acquaintance’s house. She stated that upon news of Pierce’s death, the female acquaintance dropped her off in Bridge City. Defendant further explained that her brother, who had her cell phone, went to St. Rose immediately after the killing. She denied any involvement in Pierce’s murder.

The Murder of Charles Smith

At approximately noon on August 17, 2011, the day before a scheduled motion hearing to determine the admissibility of the photographic identifications made by Smith of Defendant and McClure as the shooters in Pierce’s murder, Charles Smith, the lone eyewitness, was murdered in front of his home.[10] Eight casings were found at the scene and Ms. Rauch, the firearm and tool mark examiner expert, opined that only one gun was used in the shooting. An autopsy revealed Smith died of multiple gunshot wounds to his head, chest and leg. The murder weapon was never recovered.
IsColonel Scanlan testified that the evidence was consistent with a “targeted action,” meaning one mobile shooter started shooting from the rear of the residence in a place of cover and then moved forward down the fence line. He opined the evidence was consistent with someone who was waiting to attack Smith when he came out of his home.
*480 McClure’s brother, Jeffery Nelson, was subsequently arrested and charged with Smith’s murder.

Evidence of a Conspiracy

During his investigation of Smith’s murder, Detective Matthew Vasquez with the JPSO listened to “hundreds of hours” of jailhouse phone calls made by Defendant and McClure from the Jefferson Parish Correctional Center (JPCC) both before and after Smith’s murder.[11] Det. Vasquez explained that while neither Defendant, McClure nor Nelson admitted killing Smith in any of these phone calls, he identified several phone calls that he deemed significant. He had those calls transcribed and excerpts were played for the jury, beginning with a phone call on January 6, 2011, a few days after Pierce’s murder. During the playing of these phone calls for the jury, Det. Vasquez offered testimony as to who was talking and the meaning of the “code” language being used.
In the January 6, 2011 phone call from McClure to an unknown male, McClure stated that he’s “good” as “[l]ong as the n*gg* don’t say nothing.” On the next day, McClure assured his mother that everything was alright “long as nobody don’t say nothing.” In a call to his brother, Frank, two days later, McClure indicated that the police claimed they had one witness and “n*gg* already know who the witness is.”
|9On January 25, 2011, McClure and an unknown female facilitated a three-way call with Nelson during which McClure stated, “I ain’t trippin’ ... They don’t got no witness ... Well, they got one witness, but ... he ain’t coming to court or whatever, woo di woo.” Two days later, Nelson asked McClure how he got caught to which McClure responded, “I was acting stupid ... I was acting dumb as a mother-f* *ker son ... I was on the wrong level son.” [12]
Four days later, on January 29, 2011, McClure had another three-way call with his friend, Willis Stevenson, and Nelson. During the call, Stevenson told McClure that Defendant had not been to court and that Defendant’s attorney said she would be going home in 120 days because the State did not have any evidence. McClure responded, “Right, yeah cause my lawyer was like ‘uh you know they got one witness but uh your little brother is on that.’ When he told me that, I already know what it was {laughing), ya heard me?” Stevenson then told McClure about a conversation Defendant’s father, Terrence Daniels, had with Smith. Specifically, Stevenson said, “T went over there today, cause he was with Scooby ya know what I’m saying. So boy Scooby brought him, n*gg* was at the Fishhook. Ya know what I’m saying, he brought him to the Fishhook, I guess that where he felt comfortable at or whatever.” Later at trial, Smith’s girlfriend, Margie McKeel, testified about an incident where Smith had told her that Defendant’s father had threatened his life, telling Smith that “he *481 better not testify or else there’s going to be gunplay.”
A few months later, on June 2, 2011, Defendant called an unknown female and told her that her attorney was going to set Defendant’s next court date for June ] 102-3, 2011 but that Defendant told her attorney the date was “too early.” Defendant explained that they needed to get their discovery packets. She stated that McClure “was hollering about ... other lil dude whose name starts with a C, ya heard me. You know who I’m talking about.... I think it’s Troy’s brother, lives on Fourth Street. I ain’t gonna say his name.”[13] Later on the same day, Defendant made a call to an unknown male and told him that “they only got one witness,” who she identified as “Charles[,] Troy’s brother.” She further stated that his statement did not add up and that “he really didn’t like see nothing.”
Two days later on June 4, 2011, Defendant spoke to a man named Louis Wells and told him to contact Smith’s girlfriend, McKeel, to see what was “happening with Dude” who was “speaking on me and Q-sie [McClure].” Wells responded that he heard McKeel was staying in Algiers and that he had not seen her “back here.” Wells then handed the phone to Defendant’s brother. Defendant told her brother, “I need that boy, ya heard me?”
During another conversation between Defendant and her brother on June 8, 2011, her brother stated, “heard we pulling something off’ and that “Lil Jeff [Nelson]” is “all in.” Defendant later told her brother to acquire a “b*tch,” which was interpreted by Det. Vasquez to be slang for an untraceable firearm.[14] She then stated, “if you go f* *k with Dude or whatever— whatever man, you could do your own thing or whatever. You could take everything from there, ya heard me?” to which her brother responded, “[s]h*t gonna be lovely when you come home, son.”
|nThe next day on June 9, 2011, McClure spoke to Nelson. When Nelson asked McClure whether “Dude” was going to testify, McClure responded, “[n]ine out of ten, he ain’t going to f*ck with that.” He further informed Nelson that Defendant told him that they did not know where “Dude” was and “that’s going to work out in my favor.”
One month later, on July 8, 2011, McClure spoke to his mother who told him that the discovery packet provided by the State identified Smith as a witness. McClure’s mother told him that his next court date was set for August 18, 2011. Three days before Smith’s murder, on August 14, 2011, McClure told his friend Stevenson that he received his “paperwork” and that “Dude” was the only person who said something and he was the only reason he was being held. Stevenson then talked to McClure about having spoken to Defendant.
Six hours after Smith was murdered on August 17, 2011, McClure called Nelson and asked him whether he had heard the news about Smith and inquired as to *482 whether it was true. Nelson answered, “[y]eah,” to which McClure responded, “[w]ell, that’s good.” Nelson then told McClure that their mother did not want him talking to McClure because the call could be traced “[s]ince that sh*t happen[ed].” McClure responded, “[f|* *k it I ain’t going to call at all ... F* *k everybody, I ain’t worried about it. I’ll be home soon.” The next day, Defendant called an unknown male and told him that she was going to be released from jail. She stated, “Oh yeah, that b*teh come from court, I didn’t go though, but uh, they had slammed that Dude, you heard me? ... They had slammed that boy.” The unknown male responded, “Oh, I had heard about that sh*t.”

ASSIGNMENTS

Defendant raises four assignments of error on appeal: (1) the sufficiency of the evidence as to her second degree murder, possession of a firearm by a | ^.convicted felon and conspiracy to commit obstruction of justice convictions; (2) the denial of challenges for cause as to four prospective jurors; (3) the admission of Det. Vasquez’s testimony interpreting the jailhouse phone calls of Defendant and McClure on the basis he was not qualified as an expert; and (4) the admission of Smith’s statement to police as hearsay.

DISCUSSION

Sufficiency of the Evidence[15]
Defendant challenges the sufficiency of the evidence for her convictions. Defendant maintains that her convictions are founded almost exclusively upon the improperly admitted expert testimony of Det. Vasquez and the hearsay statement of Charles Smith. Defendant claims that without the improperly admitted evidence, the fundamental protections of due process of law require that the verdicts be set aside.
The standard of review for determining the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Both direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02); 811 So.2d 1015, 1019.
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Kempton, 01-572 (La.App. 5 Cir. |1S12/12/01); 806 So.2d 718, 722. The rule as to circumstantial evidence is “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not *483 have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83.
Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but rather whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. State v. Flores, 10-651 (La.App. 5 Cir. 5/24/11); 66 So.3d 1118, 1122. When addressing the sufficiency of the evidence, consideration must be given to the entirety of the evidence, both admissible and inadmissible, to determine whether the evidence is sufficient to support the conviction. State v. Hearold, 603 So.2d 731, 734 (La.1992).

Second Degree Murder

Defendant challenges the sufficiency of the evidence regarding her second degree murder on the basis that Smith’s statement was inadmissible. We note that Defendant challenges the admissibility of Smith’s statement in another assignment of error, which we will address separately, infra. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court first determines the sufficiency of the evidence. See State v. Hea-rold, supra.
l14La. R.S. 14:30.1 provides that second degree murder is the killing of a human being when the offender has specific intent to kill or to inflict great bodily harm. Specific criminal intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” State v. Holmes, 12-579 (La.App. 5 Cir. 5/16/13); 119 So.3d 181, 191. Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the defendant’s conduct. Id. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person, as well as the extent and severity of the victim’s injuries. Id.
Smith, who was the sole eyewitness to Pierce’s murder, lived next door to where Pierce was killed. He gave a statement to the police two days after the murder. In his statement, Smith stated he was returning to his house from the store when he saw three people, two guys and a girl, shooting at Pierce. Smith identified two of the three shooters, including Defendant, in a photographic lineup. Smith did not know the shooters’ names, but knew them socially from around the neighborhood. Smith stated that McClure was wearing blue jeans and a white shirt at the time of the shooting and had a black gun. Smith further stated Defendant was wearing a white warm-up suit with a hoodie. Smith was 100% sure in his identification of Defendant and noted that he had seen Defendant’s face at the time of the shooting. When questioned about the second male shooter, Smith stated that he never saw his face but described him as a black male wearing blue jeans and a black shirt. Smith further explained that the perpetrators were initially shooting from the street and then went into the yard. Smith then explained that McClure went closer and closer to Pierce and kept shooting until Pierce was dead.
11sSmith’s statement to the police was played for the jury and his grand jury testimony was read to the jury. Through the cross-examination of various witnesses, inconsistencies in Smith’s statement as to the proximity of his neighbor, Keith Port *484 er, to the shooting and whether Smith was inside his friend’s truck or was walking home at the time of the shooting were pointed out to the jury. Additionally, the jury was aware that Smith had gone to the store to buy beer immediately prior to the shooting and that he had a third offense DWI conviction. Det. Eserman testified that he had no reason to believe Smith was intoxicated at the time of the murder and noted that he did not believe Smith was intoxicated at the time of his statement. Further, Smith’s girlfriend, Margie McKeel, testified that Smith was not drinking, to her knowledge, when she arrived home between 6:00-6:30 p.m. on the night of Pierce’s murder.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20 (La.App. 5 Cir. 1/15/08); 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence. Id. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, this is a matter of the weight of the evidence, not its sufficiency. State v. Miller, 11-498 (La.App. 5 Cir. 12/13/11); 84 So.3d 611, 617, writ denied, 12-176 (La.9/14/12); 97 So.3d 1012.
We find that the jury made a credibility determination and chose to believe Smith, despite the slight inconsistencies, that Defendant was a shooter involved in the murder of Pierce. A review of the record reflects that the jury’s credibility | ^determination was rational. Thus, viewing the evidence in the light most favorable to the prosecution and considering both admissible and inadmissible evidence, we find a rational trier of fact could have found beyond a reasonable doubt that the State proved the essential elements of second degree murder so as to support Defendant’s conviction.

Possession of a Firearm by a Convicted Felon

Defendant challenges the sufficiency of the evidence regarding her possession of a firearm by a convicted felon on the basis that Smith’s statement was inadmissible. We note that Defendant challenges the admissibility of Smith’s statement in another assignment of error, which we will address separately, infra. When the issues on appeal relate to both the sufficiency of evidence and one or Wore trial errors, the reviewing court first determines the sufficiency of the evidence. See State v. Hearold, supra.
In order to convict a defendant of illegal possession of a firearm by a convicted felon, the State must prove beyond a reasonable doubt that the defendant had 1) possession of a firearm; 2) a prior conviction for an enumerated felony; 3) an absence of the ten-year statutory period of limitation; and 4) the general intent to commit the offense. State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12); 106 So.3d 1232,1250.
As mentioned earlier, Smith identified Defendant as a shooter in the Pierce murder, and the jury believed Smith’s statement. Smith’s identification of Defendant meets the elements that possession of a firearm and general intent to commit the offense of La. 14:95.1. At trial, the State submitted proof Defendant’s prior convictions, which included aggravated flight from an officer and possession of cocaine, and a fingerprint card to meet the remaining two elements of La. 14:95.1. Thus, *485 viewing the evidence in the light most favorable to the prosecution 117and considering both admissible and inadmissible evidence, we find a rational trier of fact could have found beyond a reasonable doubt that the State proved the essential elements of possession of a firearm by a convicted felon so as to support Defendant’s conviction.

Conspiracy to Commit Obstruction of Justice

Defendant next challenges the sufficiency of the evidence regarding her conspiracy to commit obstruction of justice conviction. We note that Defendant challenges the admissibility of Det. Vasquez’s testimony pertaining to the jailhouse phone calls in another assignment of error, which we will address separately, infra.
Criminal conspiracy requires an agreement or combination of two or more persons for the specific purpose of committing any crime, an act in furtherance of the object of the agreement or combination, and specific intent. La. R.S. 14:26. Obstruction of justice criminalizes (1) the use or threat of force toward the person or property of another with the specific intent to influence the testimony of any person in any criminal proceeding or cause or induce the withholding of testimony from any criminal proceeding; and (2) retaliating against any witness by knowingly engaging in conduct which results in bodily injury to such person with the specific intent to retaliate against the person for the attendance as a witness to any criminal proceeding or for producing evidence or testimony for use or potential use in any criminal proceeding. La. R.S. 14:130.1(A)(2) and (3).
A review of the record shows the evidence considered in its entirety is sufficient to support Defendant’s conviction for conspiracy to commit obstruction of justice. The State introduced numerous jailhouse phone calls between Defendant, McClure, Nelson and other persons wherein there is much discussion regarding Smith being the sole eyewitness to Pierce’s murder. In these calls, McClure is heard saying that all will be good as long as Smith does not testify and |isthat Smith will not be coming to court. There is discussion about “pulling something off’ and not being able to locate Smith, which in McClure’s words, “that’s going to work out in my favor.” Defendant is heard in one call discussing the whereabouts of Smith and the fact that he was the only witness. There are also calls involving the defendants about acquiring a “b*tch,” interpreted by Det. Vasquez as an untraceable gun, and “f*ck[ing] with Dude,” identified to be Smith. Smith is then murdered one day before a scheduled hearing on a motion to suppress identification in connection with the Pierce murder.
We find that viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the State proved the essential elements of conspiracy to commit obstruction of justice so as to support Defendant’s conviction.

Admission of Det. Vasquez’s Testimony

In this assignment of error, Defendant argues that the trial court erred in allowing Detective Vasquez to testify as to the purported “secret code” meaning of the words captured on the recorded jail conversations. In particular, Defendant contends that Detective Vasquez was improperly permitted to tell the jury that “T” referred to Terrence Daniels, Defendant’s father; “Dude” was a coded reference for Smith; and the term “b*tch” meant an illegal or untraceable gun. In allowing this testimony, Defendant argues that Detective Vasquez was permitted to express his opinion that Defendant and her co-defendants were all guilty of the crimes *486 charged. Defendant maintains that Detective Vasquez gave expert opinion testimony for which a Daubert[16] hearing should have been held. Defendant concludes that because Detective Vasquez’s opinion testimony was crucial to Improve the charges, the trial court’s error in permitting this testimony was not harmless error and mandates reversal of her convictions.
At trial, numerous taped jailhouse phone calls made using Defendant’s and McClure’s assigned PIN numbers were introduced into evidence and played for the jury during the testimony of Det. Vasquez. At the beginning of Det. Vasquez’s testimony, Defendant’s attorney made a preemptive objection to Det. Vasquez’s interpretation of the phone calls, including his decipherment of the “code” the speakers may have been using. McClure’s counsel joined in the objection. The State contended that Det. Vasquez would be identifying the speakers and translating their conversations on the basis of his experience as a police officer. Defendant’s attorney maintained that Det. Vasquez’s translation was beyond lay witness testimony and required his qualification as an expert witness in “street slang.” The trial court found the objection premature.
After a weekend recess, the matter was discussed in further detail prior to the continuance of Det. Vasquez’s testimony. Defense counsel’s main objection was to Det. Vasquez’s anticipated interpretation of the term “b*tch,” as used by Defendant in one of the phone calls, to mean a firearm. The trial court ruled that Det. Vasquez would be prohibited from interpreting Defendant’s state of mind or her intent at the time of her statement, but that he would be permitted to explain to the jury what he has come to know the term “b*teh” to mean based on his many years of experience on the street as a police officer. The trial court determined Det. Vasquez’s testimony in this regard did not require him to be qualified as an expert.
Det. Vasquez then proceeded to testify that he listened to “hundreds of hours” of recorded jailhouse phone calls made by Defendant and McClure to individuals outside the jail. Det. Vasquez testified that the defendants used lots of | an“code talk” and nicknames in their conversations. He explained that he was able to identify the various individuals participating in the telephone conversations based on listening to hours of phone calls and hearing names mentioned during the calls which identified the person being spoken to. Det. Vasquez stated that in those circumstances where he could not identify the speaker, he referenced the speaker as “unknown male” or “unknown female.” He admitted on cross-examination that he was not a voice expert, but stated that he had come to learn the various voices after listening to the “hours and hours” of phone calls and corresponding PIN numbers.[17]
Det. Vasquez testified that of the 17 discs of recorded phone calls, he found seven of the discs to be relevant to the investigation of the present case. The pertinent phone conversations were transcribed and played for the jury. One of the key phone calls was on June 8, 2011 between Defendant and her brother, wherein Defendant used the term “b*tch” several times. Det. Vasquez explained that in his nine years as a police officers and the “countless” cases he has investigated, he has become familiar with the use *487 of various slang terms used by individuals who live in the communities he patrols within Jefferson Parish. He testified that he has heard the term “b*tch” used in a variety of different contexts, and that in the context of the phone call at issue the term referred to an untraceable gun. Det. Vasquez also testified as to his interpretation of whom “T” and “Dude” referenced.
We note that Defendant objected to Det. Vasquez’s testimony as it related to his interpretation of the word “b*tch” but did not object concerning Det. Vasquez’s interpretation of “T” or “Dude.” Failure to make a contemporaneous objection precludes appellate review. See La.C.Cr.P. art. 841. Thus, we find Defendant’s argument concerning this testimony has been waived. Nonetheless, we will |⅞1 address the assignment with respect to Det. Vasquez’s testimony in general as it relates to the identification of the participants in the phone conversations and his interpretation of the “slang” used.
The testimony of a lay witness in the form of opinions or inferences, who is not testifying as an expert, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. C.E. art. 701; State v. Keller, 09-403 (La.App. 5 Cir. 12/29/09); 30 So.3d 919, 930-31, writ denied, 10-267 (La.9/17/10); 45 So.3d 1041. A law officer may testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert. See State v. Le-Blanc, 05-885 (La.App. 1 Cir. 2/10/06); 928 So.2d 599, 603. However, only experts are allowed to give opinion testimony in areas of specialized knowledge.[18] A reviewing court must ask two questions to determine whether the trial court properly allowed lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness’ observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. Id. at 602-03.
“Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.” La. C.E. art. 704; State v. Higgins, 03-1980 (La.4/1/05); 898 So.2d 1219, 1234, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). In other words, the fact an opinion or inference embraces an ultimate issue in a case does not preclude its admissibility. La. C.E. art. 704, Comment (c); State v. King, 99-1279 (La.App. 5 Cir. 4/25/00); 760 So.2d 540, 543, writs denied, 00-1452 and 00-1498 (La.3/16/01); 787 So.2d 298. The trial court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony. State v. Friday, 10-2309 (La.App. 1 Cir. 6/17/11); 73 So.3d 913, 922, writ denied, 11-1456 (La.4/20/12); 85 So.3d 1258.
Upon review, we find the trial court did not err in allowing Det. Vasquez to testify as a lay witness under La. C.E. art. 701 as to inferences regarding the contents of the recorded phone conversations based on his own observations and experiences. In State v. Decay, 01-192 (La.App. 5 Cir. 9/13/01); 798 So.2d 1057, 1072-74, writ denied, 01-2724 (La.8/30/02); *488 823 So.2d 939, this Court found a trooper’s testimony interpreting “slang” in a telephone conversation to be permissible lay testimony under La. C.E. art. 701, despite the defendant’s argument that expert testimony was required and that the trooper had not been qualified as an expert. The trooper in Decay interpreted the defendant’s statement, “I be trying to get me about two, bra,” to mean that the defendant wished to buy two kilograms of cocaine. This Court determined that the trooper’s testimony was to inferences made based on his observations and his experience of being a State trooper for seven years.
Additionally, in State v. Jefferson, 04-1960 (La.App. 4 Cir. 12/21/05); 922 So.2d 577, 596-97, writ denied, 06-940 (La.10/27/06); 939 So.2d 1276, the defendant objected to a detective’s identification of an eyewitness’ voice on a 9-1-1 recording. The detective testified that he recognized the witness’ voice based on the time he spent with him during his interview and investigation of the case. The Fourth Circuit found the detective’s opinion regarding the identification of the voice was rationally based on his perception and was helpful to ajjgdetermination of a fact in issue regarding the phone call, thereby satisfying the requirements of La. C.E. art. 701.
Furthermore, we are persuaded by King v. United States, 74 A.3d 678 (D.C.2013), cited by the State, which interprets the Federal Rules of Evidence upon which La. C.E. art. 701 is based.[19] In King, the defendant argued the trial court erred in allowing a police officer and a detective to testify as lay witnesses as to the meaning of certain “street lingo” used in recorded jailhouse phone calls.[20] The defendant maintained the officers were testifying about a specialized subject beyond the understanding of the average lay person. The officers explained that they based their “street lingo” interpretations on their lengthy experience working on criminal investigations in the area and regularly speaking about crime with young people in that community. The appellate court found the trial court properly admitted the officers’ testimony as lay witness testimony because “the witnesses based their opinions on their personal experiences and observations and used reasoning processes familiar to the average person in everyday life to reach their proffered opinion.”
The appellate court explained that lay testimony is that which “results from a process of reasoning familiar in everyday life,” whereas “an expert’s testimony results from a process of reasoning which can be mastered only by specialists in the field.” King, 74 A.3d at 682 (internal citations omitted). The court concluded that the “reasoning process employed to interpret the street language was the everyday process of language acquisition” and that the officers “did not use any special training or scientific or other specialized professional knowledge to form l^their opinions about the meaning of the language used by the individuals in this case.” Id. at 683.
In this case, Det. Vasquez testified as to his opinion of the meaning of certain “slang” words in the recorded phone calls based on his personal experiences and observations. Specifically, Det. Vasquez stated that his knowledge was gained from *489 his nine years of experience as a police officer and the “countless” cases he has investigated in the community. He explained that he has come to understand the meaning of various slang terms through his contact with and interviewing of various individuals during his employment as a police officer. He further explained that he was able to identify the various individuals in the phone calls from listening to “hundreds of hours” of phone calls involving the defendants and his investigation into the case.
Thus, we conclude that Det. Vasquez’s opinion was properly admitted as lay testimony that resulted from his observations and experiences as a police officer. We find his opinions resulted from the “process of reasoning familiar in everyday life,” as opposed to “a process of reasoning which can be mastered only by specialists in the field.” Further, Det. Vasquez’s testimony provided the jury with relevant factual information about the investigation, including the meanings of terms used in the conversations and the identification of the individuals referenced during the phone calls.

Admission of Smith’s Statement

In this assignment of error, Defendant challenges the admission of Smith’s statement as inadmissible hearsay. She contends the trial court erred in allowing the statement under the “forfeiture by wrongdoing” hearsay exception embodied in La. C.E. art. 804(B)(7)(a). In particular, Defendant maintains the State failed to establish by a preponderance of the evidence that she was the person that procured | ¡¡¡¡Smith’s absence from trial. She further argues that the admission of Smith’s statement denied her of her right to confrontation as set forth in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), thereby rendering La. C.E. art. 804(B)(7)(a) unconstitutional.
Prior to trial, hearings were held on the State’s motion to admit Smith’s statement under La. C.E. art. 804(B)(7)(a). During the hearings, Det. Vasquez testified that Defendant and McClure were identified by eyewitness Smith as shooters in Pierce’s murder. Smith was subsequently murdered outside of his home on August 17, 2011, the day before a scheduled motion to suppress identification hearing in the Pierce case. Det. Vasquez explained that a witness saw Smith’s assailant flee the scene in the direction of McClure’s residence, but was unable to identify the perpetrator because his face was partially covered with a bandana. However, the witness described the assailant as a thin black male, between 5'8" and 5'9", medium skinned with short dreadlocks. Det. Vasquez testified that he prepared a photographic lineup of Defendant’s brother, Nelson, who fit the description of the assailant, and showed it to the witness who identified Nelson “as being the most familiar and most like the subject he saw running away from the victim.” Det. Vasquez also testified that Nelson’s cell phone records placed him within the area of Smith’s residence at the time of his murder and showed that he left the area within minutes after the murder.
Det. Vasquez further testified that Defendant and McClure were in jail at the time Smith was killed, and that he listened to numerous jailhouse phone calls they made while incarcerated. The recorded phone calls introduced at trial were also introduced at the 804 motion hearing. Det. Vasquez explained that the phone calls linked Defendant, McClure and Nelson and showed they had a method of communication between them.
|2sPet. Vasquez noted that Smith had been previously threatened — once by McClure the day after Pierce’s murder and once by Defendant’s father who told *490 Smith that he would not “make it to court” if he testified at trial. Det. Vasquez explained that at the time Smith was interviewed and identified Defendant and McClure, he feared for his life and was concerned he may be retaliated against for being a witness in the Pierce murder trial.
Det. Vasquez explained that Defendant’s involvement in Smith’s murder was evident from the jailhouse phone calls, which included a call referencing her father’s threat to Smith. He noted McClure expressed his satisfaction that Smith had been killed and stated that he would “be home soon,” since Smith was the only reason he was still in jail.
The trial court initially denied the State’s 804(B)(7) motion, finding the State had not met its burden of proof in establishing by a preponderance of the evidence that Defendant and McClure “engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.” Upon the State’s motion for reconsideration and its submission of additional jailhouse phone conversations, the trial court vacated its original ruling and found Smith’s statement was admissible for use at trial.
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04); 880 So.2d 841, 852, writ denied, 04-1399 (La.11/8/04); 885 So.2d 1118. In Crawford, supra, the Supreme Court restricted the admissibility of testimonial statements as evidence at a criminal trial in situations where the declarant is unavailable to testify and required that the defendant have a prior ^opportunity to cross-examine the declarant.[21] However, the Crawford court recognized exceptions to the right of confrontation, including the doctrine of “forfeiture by wrongdoing,” which is premised on the principal that a defendant should not be permitted to benefit from his own wrongdoing. State v. Warner, 12-85 (La.App. 4 Cir. 5/1/13); 116 So.3d 811, 820.
In order to admit testimonial hearsay evidence under the forfeiture by wrongdoing exception, the prosecution must show that the defendant intended to prevent a witness from testifying. Giles v. California, 554 U.S. 353, 361, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). This includes situations, as set forth under Federal Rule of Evidence 804(b)(6), where the defendant engages in or acquiesces in wrongdoing that was intended to, and did, procure the' unavailability of the declarant as a witness. Id., 554 U.S. at 367, 128 S.Ct. at 2687, citing Davis v. Washington, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
Under La.. C.E. art. 804(B)(7), which is modeled after Federal Rule of Evidence 804(b)(6), “[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of *491 the declarant as a -witness,” is an exception to the hearsay rule. The party seeking to introduce the statement under this exception must establish by a preponderance of the evidence that the party against whom the statement is being offered engaged or acquiesced in the wrongdoing. La. C.E. art. 804(B)(7)(b).
In the present case, Defendant admits in her brief that the evidence shows she acquiesced in the wrongdoing, but she maintains that acquiescence in the wrongdoing is insufficient to allow admission of a hearsay statement. As stated Dsabove, the United States Supreme Court has approved of the application of the forfeiture by wrongdoing exception to hearsay where a defendant acquiesces in the wrongdoing as long as he had the intent of making the witness unavailable. See Giles, 554 U.S. at 367, 128 S.Ct. at 2687.
The evidence offered by the State, including Det. Vasquez’s testimony and the recorded phone conversations made by Defendant and McClure, establishes by a preponderance of the evidence that Smith’s murder was committed to ensure his unavailability as a witness at Defendant’s murder trial, and that Defendant acquiesced in the wrongdoing that procured Smith’s unavailability.
Before Smith was murdered, he expressed fear for his life and believed he would suffer retaliation for his testimony against Defendant' and McClure in the Pierce murder trial. Smith’s life was threatened by McClure the day after Pierce was murdered and was also threatened by Defendant’s father when it became apparent that Smith would likely testify at trial. Smith was murdered shortly after the State provided a discovery packet to the defense naming Smith as a witness, and one day before a hearing on Defendant’s motion to suppress identification.
Investigation into Smith’s murder pointed to McClure’s brother as the shooter, whose only apparent motive was the fact Smith was the only witness in the murder case pending against Defendant and McClure. Numerous jailhouse phone conversations following Defendant’s arrest for Pierce’s murder established that Defendant engaged in discussions with multiple individuals about Smith being the only eyewitness to Pierce’s murder. The phone calls demonstrated Defendant’s desire and effort to procure Smith’s unavailability for trial. Specifically, the jail telephone calls revealed Defendant had a discussion with a friend about the importance of obtaining a copy of her discovery packet so that a copy could be provided to her friends on the “outside.” Also, two weeks before the motion to ^suppress hearing Defendant stated, “only person speaking on me is this f*cking dude Charles (Smith).” She further indicated her desire to locate Smith. Additionally, less than two months before Smith’s murder Defendant had a discussion with her brother during which time her brother expressed Nelson’s readiness to take action against Smith. Defendant is heard encouraging her brother to use a “b*tch” (interpreted by Detective Vasquez to be an unregistered firearm) when encountering Smith. Defendant also expressed satisfaction upon learning of Smith’s murder..
Based on this evidence, we find no error in the trial court’s determination that the State met its burden of proving by a preponderance of the evidence that Defendant engaged or acquiesced in wrongdoing intended to procure Smith’s unavailability for trial and in applying the forfeiture by wrongdoing exception to the hearsay rule thereby allowing Smith’s statement into *492 evidence at trial.[22] Thus, we find Smith’s statement to the police was properly admitted into evidence at trial and its admission did not violate Defendant’s Sixth Amendment right to confrontation.

ERRORS PATENT

Upon review of the record for errors patent under La.C.Cr.P. art. 920, we note the following errors that require corrective action.
First, the State of Louisiana Uniform Commitment Order reflects January 13, 2011, as the date of the offense; however, the record reflects that the offenses |3non counts one and five occurred on January 2, 2011, and the offense on count eight occurred on or between January 3, 2011 and August 17, 2011. The correct dates of the offenses need to be corrected.
Additionally, there is a discrepancy between the transcript and the commitment. The transcript reflects that the trial court imposed Defendant’s 20-year sentence on count five (felon in possession of a firearm) without benefit of parole, probation or suspension of sentence. However, the commitment does not reflect the restriction of these benefits on count five. When there is a discrepancy between the commitment and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
Accordingly, we remand this matter for correction of the commitment and the State of Louisiana Uniform Commitment Order as noted above, and the Clerk of Court for the 24 Judicial Court is ordered to transmit the original of the corrected commitment and Uniform Commitment Order to the officer in charge of the institution to which Defendant has been sentenced and the Department of Corrections’ legal department. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12); 106 So.3d 1136,1142.

DECREE

For the foregoing reasons, Defendant, Chasity Griffin’s, convictions and convictions are hereby affirmed. The matter is remanded for the correction of the commitment and the Uniform Commitment Order as instructed above.

CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF COMMITMENT.

. Co-defendant McClure was also charged with the second degree murder of Theodore Pierce, possession of a firearm by a convicted felon, and conspiracy to commit obstruction *477 of justice. Co-defendant Nelson was charged with the second degree murder of eyewitness Charles Smith, possession of a firearm by a convicted felon, and conspiracy to commit obstruction of justice.

. The residence located at 235 Fourth St. belonged to Keith Porter, who Pierce was visiting.

. Photographic lineups of Defendant and McClure were prepared after police received the anonymous tip specifically naming them as being involved in the shooting.

. Brenda Mitchell lived at this address. She told police that she saw someone shooting, but she could not identify the shooter.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The anonymous tip to police after Pierce's murder named Tenisha Williams, Reginald Lewis’ girlfriend, and Dwayne Lewis, Reginald Lewis' brother, as the two other people being involved in the Pierce shooting.

. Det. Eserman testified that a suspect in the Lewis murder had been arrested prior to Pierce's murder and that there was no information in Lewis' murder investigation that showed Pierce was involved in Lewis' murder.

. Two guns were seized from the residence; however, neither gun was found to have any connection to Pierce's murder.

. Joseph Trawkicki, custodian of records for Sprint, testified that he provided cell phone records for a phone number listing Defendant as the subscriber. The phone records indicated that an inbound call was received on Defendant's phone from McClure’s cell phone number shortly before Pierce's murder at 4:18 p.m. on January 2, 2011. The records further showed that a second outgoing call was made from Defendant’s phone to McClure's phone at 4:21 p.m. on the same day. These two calls used a cell phone tower in Bridge City. Thereafter, at 4:47 p.m., an inbound call to Defendant’s phone used a cell phone tower in St. Rose.

. The trial court took judicial notice of the fact the record did not contain a subpoena for Smith to testify at the August 18, 2011 motion hearing. Detective Matthew Vasquez explained to the jury that eyewitnesses are not typically called to testify at such pretrial hearings, but rather police officers are the ones who testify.

. Det. Vasquez explained that each inmate has a PIN, or identification, number that he or she enters when making a call and that all phone calls are recorded.

. On cross-examination, Det. Vasquez disagreed with McClure's counsel who argued that McClure was not the person speaking during this portion of the phone conversation. Counsel argued that McClure handed the phone to someone in jail named “Jeb or Jab,” a.k.a. Jabori Davis, and that it was Davis, not Defendant, who was talking about how he got caught. Defense witness Jeremy Feazell testified that the voice previously identified by Det. Vasquez as McClure's, was actually his cousin, Davis', voice. The parties stipulated that Davis was incarcerated in JPCC at the time of the phone call on January 27, 2011, and that he a court date in February 2011.

. Det. Vasquez testified that Defendant was referring to Charles Smith.

. Defendant testified that this phone conversation was misinterpreted by Det. Vasquez. She claimed that her brother's statement, "heard we pulling something off,” referred to her brother’s attempt to acquire funds to pay for her lawyer. Defendant explained that her brother wanted to sell drugs to pay her lawyer’s fee but he was having trouble getting the drugs from a supplier. Defendant explained her reference to the term "b*tch” was a reference to her drug supplier's female friends. According to Defendant, she told her brother to contact one of the supplier’s female friends, a.k.a "b*tch,” and have them buy the drugs because the supplier would be more inclined to sell drugs to one of his "girls.”

. The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821; State v. Hooker, 05-251 (La.App. 5 Cir. 1/17/06); 921 So.2d 1066, 1074. In the present case, Defendant did not file such a motion; however, the failure to file a post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. State v. Robinson, 04-964 (La.App. 5 Cir. 2/15/05); 896 So.2d 1115, 1120, n. 3.

. Daubert v. Meirell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. As previously noted, each inmate has a PIN, or identification, number that he or she enters when making a call from JPCC, and that all phone calls are recorded.

. Under La. C.E. art. 702, “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”

. See Louisiana Official Revision Comment (b) to La. C.E. art. 701, "This Article follows Federal Rule of Evidence 701 verbatim.”

. The officer testified that the term "gleezy” is a street term for a Gloclc gun and that the term “40” referred to a .40 caliber semiautomatic gun. Additionally, the detective testified that the term "bagged” meant robbing someone and stealing their stash.

. While the Crawford court did not fully define "testimonial/' it recognized that the Sixth Amendment bestows a right of confrontation to a defendant to confront witnesses who "bear testimony” against him. The Supreme Court noted that "an accuser who makes a formal statement to government officials bears testimony in a sense that a person making a casual remark to an acquaintance does not.” Crawford, 541 U.S. at 51, 124 S.Ct. at 1364. The Crawford court referred to statements as testimonial that were made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial. State v. Leonard, 05-42 (La.App. 5 Cir. 7/26/05); 910 So.2d 977, 989-90, writ denied, 06-2241 (La.6/1/07); 957 So.2d 165.

. See State v. Johnson, 13-343 (La.App. 4 Cir. 10/1/14), 151 So.3d 683, where the Fourth Circuit found the State established by a preponderance of the evidence, based on two phone calls made by the defendant on the same day the declarant was murdered, that the defendant procured or acquiesced in the murder of the declarant and, thus, the forfeiture by wrongdoing exception applied to allow the admission of the declarant's statement to police; United States v. Dinkins, 691 F.3d 358, 384 (4th Cir.2012), cert. denied, - U.S. -, 133 S.Ct. 1278, 185 L.Ed.2d 214 (2013), where the federal appellate court found that the forfeiture by wrongdoing exception applied to a defendant whose co-conspirators murdered a declarant intending to prevent him from testifying, which was reasonably foreseeable by the defendant and in furtherance of the conspiracy; and United States v. Cherry, 217 F.3d 811, 820 (10th Cir. 2000), holding that a "declarant's statements may be admitted against a person who participated in a conspiracy to silence the declarant even if that person did not himself engage in witness intimidation or other wrongdoing.”