| STATE OF LOUISIANA | * | NO. 2025-KA-0191 |
| VERSUS | * | COURT OF APPEAL |
| CHARLES PENN | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 555-791, SECTION "E"
Judge Rhonda Goode-Douglas
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*
(Court composed of Judge Joy Cossich Lobrano, Judge Rachael D. Johnson, Judge
Karen K. Herman)

Christopher A. Aberle
LOUISIANA APPELLATE PROJECT
P.O. Box 8583
Mandeville, LA 70470

COUNSEL FOR DEFENDANT / APPELLANT

Jason R. Williams
DISTRICT ATTORNEY
Brad Scott
CHIEF OF APPEALS
Peter J. Vesich
ASSISTANT DISTRICT ATTORNEY
619 S. White St.
New Orleans, LA 70119

COUNSEL FOR STATE OF LOUISIANA / APPELLEE

**AFFIRMED AND REMANDED WITH INSTRUCTIONS**
**FEBRUARY 10, 2026**

Defendant, Charles Penn ("Defendant"), appeals his conviction and sentence for second degree murder. For the following reasons, we affirm Defendant's conviction and sentence. We further remand the matter for the purpose of correcting the minute entry of November 8, 2024 and the commitment order, if needed, to conform with the sentencing transcript and accurately reflect the sentence received.

**PROCEDURAL HISTORY**

On October 13, 2022, Defendant and Travis C. Scott ("Scott") were indicted with one count of second-degree murder of Derrell Brooks ("Brooks"), in violation of La. R.S. 14:30.1; one count of obstruction of justice in a homicide investigation, in violation of La. R.S. 14:130.1; and one count of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1.[1]

On December 1, 2022, the Defendant and Scott appeared for arraignment and entered pleas of not guilty on all charges. The same date, Defendant filed several pre-trial motions, including a motion to suppress.

---

[1] The record shows that Defendant and Scott were jointly charged for second degree murder and obstruction of justice. They were separately charged with possession of a firearm.

1

On June 13, 2023, Scott entered into a plea agreement with the State, wherein Scott withdrew his prior pleas and pled guilty to obstruction of justice and felony possession of a firearm in exchange for a sentence on each count of twenty years, with fifteen years suspended, and three years active probation, to run concurrently. Also, as part of the plea agreement, the State entered a *nolle prosequi* on second degree murder charge and agreed not to file a multiple offender bill against Scott.

On September 29, 2023, the trial court denied Defendant's motion to suppress. Defendant sought writs, which was denied by this Court. *See State v. Penn*, *unpub*., 2023-0750 (La. App. 4 Cir. 12/18/23).

A jury trial commenced on September 4, 2024 and continued through September 9, 2024.[2] At the conclusion of trial, the jury found Defendant guilty as charged on all counts.

On November 8, 2024, Defendant filed a motion for a new trial and motion for post-verdict judgment of acquittal. The trial court denied the motions the same date. Thereafter, the trial court sentenced Defendant to life at hard labor for second degree murder; forty years at hard labor for obstruction of justice in a homicide investigation; and twenty years at hard labor for felony possession of a firearm. All the sentences were imposed without the benefit of parole, probation, or suspension of sentence.[3]

---

[2] Prior to proceeding to trial, Defendant filed a motion to quash jury venire and motion for new trial based on an alleged late disclosure by the State. Both motions were denied by the trial court.

[3] As noted later in the errors patent section, there is a discrepancy in the record regarding the sentences imposed.

Defendant filed a motion to reconsider, which was denied by the trial court. Defendant then filed a motion for appeal and motion to withdraw counsel. The trial court granted the motions. This appeal followed.

**FACTS**

Defendant's conviction stems from the murder of Brooks on June 8, 2022. The record shows that Brooks was contacted by Scott to purchase marijuana. Defendant and Scott went to Brooks apartment at 8002 Trapier Avenue to obtain the drugs. Once there, Defendant shot Brooks twice in the back. The men fled the scene with the drugs and Brooks's cell phone.[4]

At trial, the State offered the testimony of six witnesses.[5] The defense did not call any witnesses.

**Detective Nicholas Davis** ("Det. Davis") of the NOPD Homicide Division testified that he investigated the shooting in the 8000 block of Trapier Avenue. He was made aware of the incident following a 911 call at 3:23 p.m. on June 8, 2022, advising that a male had been shot. The 911 call was introduced and played before the jury.[6] He stated he was not on the initial crime scene because it was classified as an aggravated battery. After the victim died at the hospital at 7:30 p.m., the case was assigned to him and he investigated the crime scene the following day. Photographs were taken of the crime scene, identified by Det. Davis, and offered into evidence. In the photographs, there are numbered markers indicating

---

[4] As discussed herein, there was also testimony that Brooks was disarmed during the encounter. Brooks's gun, however, was not recovered.

[5] Prior to proceeding with witnesses, the parties stipulated that Defendant had previously pled guilty to one count of second-degree battery on December 12, 2013 and received two years imprisonment, suspended, and placed on two years active probation.

[6] In the 911 call, the caller advises that a man had been shot at 8002 Trapier Avenue. The 911 operator instructs the caller to apply pressure to the victim's gunshot wounds with a clean towel.

individual pieces of evidence, which included, a spent TelaAmmo 7.62x39 shell casing.

Det. Davis stated that he contacted the manager of the apartment building where the crime took place and was advised that a black Nissan Infinity SUV was seen arriving and fleeing the scene. He stated as part of his investigation he reviewed the June 8, 2022 surveillance video from 8002 Trapier Avenue, which was introduced into evidence.

The surveillance video depicted a black Infiniti in a driveway of the Trapier apartments and Scott speaking with a female neighbor at 1:33 p.m. who said she does not have "any" and to come back later. The vehicle departed at 1:37 p.m. The car returned to Trapier Avenue at 2:55 p.m. Video footage at 3:22 p.m. showed Brooks on the ground after the shooting. One voice says "come on, man" and another shouts "let's f*cking go, man." The car pulled off and the victim yelled for help. A neighbor came to help Brooks at 3:26 p.m.

Det. Davis also testified that during his investigation he reviewed the leasing documents of Trapier apartments and learned that Defendant's sister, Courtney Penn ("Courtney") had previously leased an apartment with her boyfriend, Scott. The leasing documents also listed 7512 Jonlee Drive as Courtney's previous address. Det. Davis relocated to Jonlee Drive and observed a black Nissan Infinity SUV parked in front of the residence.

A search warrant of the vehicle was obtained and introduced into evidence for recording keeping purposes. The search warrant revealed an extended black nine-millimeter magazine for a firearm under the driver's seat of the vehicle.

A search warrant was also obtained for the Jonlee residence, which was introduced for record keeping purposes. Body cam footage of Det. Davis's partner,

4

Detective Walter Edmond, documenting the search was presented and offered into evidence.

Det. Davis testified that during the search, the police found a red Jordan backpack in a bedroom closet. Inside the backpack the police recovered a rifle, with a bandanna wrapped around; live rounds of TelaAmmo, which matched the casing found at the crime scene; and a check stub, dated May 7, 2022 addressed to Defendant at 7512 Jonlee Drive. In the closet, the police also found a black nine-millimeter handgun with a green grip, which matched the magazine seized from the vehicle. A magazine for the rifle was also found on the chair in the bedroom, containing live rounds.

Det. Davis said the police also found numerous gun box cases in another bedroom. The boxes did not contain firearms but contained empty magazines. The backpack, bandanna, check stub, rifle, ammunition, magazine for the rifle handgun, and gun boxes were introduced into evidence.

Later, Det. Davis obtained surveillance from motion activated cameras at 7512 Jonlee Drive, which showed Defendant and Scott enter a black SUV at 12:50 p.m. on June 8, 2022. Defendant entered the driver's side; Scott entered the passenger side. The car pulled out of the driveway at about 12:52 p.m. Det. Davis noted the white handkerchief on the dashboard is consistent with the surveillance video obtained from the Trapier Avenue apartments. Additional footage showed Defendant leaving the residence on Jonlee Drive with a red backpack at 2:43 p.m., and driving off in the vehicle alone. At approximately 3:39 p.m. Defendant and Scott returned to the Jonlee home. The video depicted Defendant taking a red backpack out of the backseat of the car and then both Defendant and Scott entered the residence at 3:40 p.m.

Det. Davis stated that Defendant and Scott appeared at the police station voluntarily on June 23, 2022, for questioning. The taped interviews were shown to the jury and entered into evidence.

In the interview, Defendant denied being aware of shooting or knowing Brooks. He stated that he drives the black Infiniti and that it previously belonged to his father. Defendant said Scott did not have permission to drive the Infiniti. He stated that his mother lives on Jonlee Drive. Defendant initially stated the car was parked all day at the Jonlee residence on the day of the incident, but later indicated he may have run some errands that day. Defendant denied being with Scott the day of the shooting. However, later Defendant stated he brought Scott to the Trapier apartments so that Scott could retrieve some items from his apartment. He said when he was there he observed two men come "from the back" of his vehicle and shoot at Brooks. Defendant denied purchasing drugs from Brooks. Defendant denied knowledge of the rifle in the backpack and denied that it was involved in the shooting of Brooks.[7]

Det. Davis stated, contrary to Defendant's statement, the Trapier surveillance videos do not show two men come from behind the car and shoot Brooks. He noted that at no point during the interview did Defendant implicate Scott as the shooter.

In the taped interview of Scott, he said that Defendant had contacted him about getting weed. Scott called Brooks several times to purchase marijuana but he

_____

[7] Det. Davis also testified regarding the statements made by Defendant in his interview. He noted that Defendant admitted that the vehicle belonged to his recently deceased father and Defendant drives it. Defendant also advised Det. Davis that he never left the house on the day in question. Det. Davis said when confronted with the surveillance video of leaving the residence, Defendant backtracked and said he just went to the store and came right back. Defendant also denied being with Scott that day.

6

did not answer. Scott said they went to apartment 1-B on Trapier Avenue to see about obtaining weed. Defendant said he wanted to get an ounce or two of weed. Scott said Brooks was nearby working under the hood of the car and indicated he did not have any weed at the time. Scott said Brooks later called him and said he was ready. Scott said that he contacted Defendant. Defendant then picked him up in the car. He said he observed a handgun with a green handle in Defendant's car and took it because he did not want any trouble. They returned to the Trapier apartments and Scott exited the car. Scott said he was on the phone when Brooks arrived with the weed. He stated all of a sudden, he heard a commotion and then grabbed the handgun and pointed it towards Defendant and Brooks. Scott stated that he then observed Defendant had a gun. Scott said he was in shock and shouted at Defendant. Defendant then yelled at him to get the weed, which was on the ground. Scott said that Brooks had a gun in his waistband and also handed it over to Defendant while at gunpoint. Defendant then told Brooks to run, Brooks turned, and Scott heard two gunshots. Scott said when they drove off, he noticed that Defendant had a red backpack in the backseat. He also stated that Defendant threw Brooks phone off the interstate by Crowder Blvd. Scott said after the shooting, they went to the store for beer, went to his home, and then returned to the Jonlee residence.

Det. Davis testified that Brooks's phone was tracked to the intersection of Crowder Blvd. and I-10. The screen shot of the phone's location was introduced into evidence.

Det. Davis testified that he obtained an arrest warrant for Defendant for second degree murder based on the surveillance videos and Scott's statement describing Defendant as the shooter and the firearm used, and "then our locating

7

that same firearm that was described in the shooting."[8] The arrest warrant was entered into evidence for record keeping purposes.

On cross-examination, Det. Davis admitted that an arrest warrant was also issued for Scott. He noted Scott advised that at one point during the incident, he became startled and took "the firearm from his waistband and point[ed] it in the direction of [Defendant] and [ ]Brooks and ask[ed] what's going on." Det. Davis explained that Scott indicated that he discovered this handgun in Defendant's car on the way to the Trapier apartments.

Det. Davis acknowledged that Defendant's DNA was not found on the gun or the backpack. Det. Davis also admitted that Brooks was Scott's neighbor and Scott frequently purchased marijuana from him in the Trapier apartments. He conceded that there was no cell phone data linking Brooks and Scott. When questioned about Scott's demeanor in the Jonlee surveillance videos, Det. Davis conceded that Scott did not appear fearful or angry. However, Det. Davis noted Scott indicated that he chose to arm himself the day of the shooting because he "knew [Defendant] was armed… [a]nd based on [Defendant's] behavior in the past with firearms, [Scott] thought it was safer for him to be in possession of a handgun." Det. Davis testified that Defendant did not have a relationship with Brooks prior to the incident.

Det. Davis denied there was no evidence aside from Scott's statement that indicated Defendant was the individual who had fired the weapon that had killed Brooks. He noted that, in addition to Scott's statement identifying Defendant as the shooter, Defendant was in possession of a red backpack containing the murder

---

[8] Det. Davis also described why Defendant was charged with obstruction and felon in possession of a firearm.

weapon, and the weapon and backpack were recovered from the Defendant's home. Det. Davis explained: "[t]he only living witness identified [Defendant] as the shooter and that's corroborated by the evidence."

On redirect, Det. Davis said it is common when people sell drugs to use a burner phone to conduct their business. He stated that there is no testimonial evidence nor physical evidence suggesting that Scott shot Brooks.

**Scott** testified that he knew Defendant because at the time he was dating Defendant's sister Courtney. He also has a baby with Courtney. Scott stated his testimony was part of his plea agreement with the State. The plea form was introduced for identification purposes.

Scott testified that he had previously lived with Courtney at 8002 Trapier Avenue for about two months. He said he visited the Trapier apartments with Defendant the day of the murder on two occasions.[9] He first went to a female neighbor's apartment to purchase marijuana but was told to come back later. Scott said he and Defendant later returned to the apartments after learning Brooks had marijuana.

Scott identified himself and the neighbor to whom he initially spoke in the Trapier surveillance video. He also identified the vehicle Defendant was driving. Scott also identified Defendant in the Jonlee surveillance video and stated that Defendant lived at 7512 Jonlee Drive.

Scott stated that after he and Defendant left Trapier Avenue the first time, Brooks had called him and told him to advise his "brother-in-law" that he was "ready." Scott called Defendant to pick him up from his house and they returned to

---

[9] Scott's trial testimony is similar to the statement he provided to the police.

the Trapier apartments. Scott said when they arrived, he was on a phone call but advised Brooks that Defendant was going to "cop the weed from [Brooks]." Scott said he heard commotion and as a "natural reflex" he "upped the gun, and pointed it at both of them." He then noticed that Defendant had a rifle pointed at Brooks. Scott also indicated that Defendant had disarmed Brooks. According to Scott, as Brooks knelt on "one knee" he handed over a gun that was "behind his back" to Defendant.[10] Scott said he then heard two shots and observed Brooks fall down. Scott indicated that Defendant "ordered" him to "get the weed" off the ground. Scott also took Brooks's phone and gave it to Defendant. Scott stated that Defendant threw Brooks's phone out of the vehicle's window near Crowder Blvd. and the interstate. After the shooting, Scott and Defendant went to a store for beer and cigarettes, dropped beer off at his house,[11] then returned to Defendant's house on Jonlee.

Scott identified the voices heard in the Trapier surveillance video. He said that he was the one who shouted "come on, man" because he did not expect that to happen because they were just there to purchase marijuana. Scott testified that he did not know that Defendant intended to rob and shoot Brooks. Scott identified Defendant's voice as the one who screamed "now, let's f*cking go." Scott also identified the rifle as well as the handgun that Scott had in his possession had at trial.

---

[10] Scott testified "Your client got him at gunpoint, Mr. Boshea. He's demanding everything from him. The man on one knee. He went behind his back, got the gun, and handed it to him." Scott did not know what happened to Brooks's gun.

[11] The record reflects that at the time of the incident Scott lived on Curran Road "right around the corner" from Jonlee Drive.

On cross-examination, Scott stated that after the shooting he did not call 911. He stated he was more worried about his own family. Scott conceded that despite being shocked by the incident, he got himself a beer and cigarettes after the shooting. He also admitted to smoking Brooks's weed. Scott acknowledged that he did not come forward for over two weeks after the shooting. He conceded that he was the one that had contacted Brooks the day of the shooting and that he had a handgun in his possession at the time of the incident. Scott insisted that it was Defendant's handgun that he was holding. He also stated he was not aware Defendant had a rifle when they arrived at the apartments.

On redirect, Scott stated that he did not bring a gun to the weed transaction. He again stated that he observed the handgun, that he later possessed, in Defendant's vehicle.

**Dr. Marianna Sandomirsky** ("Dr. Sandomirksy"), a forensic pathologist at the Orleans Parish Coroner's Office and expert in the field of forensic pathology testified that she conducted an autopsy of Brooks. She stated that his cause of death was the result of "multiple gunshot wounds of the abdomen and pelvis."

Dr. Sandomirsky stated that there were two entrance wounds near Brooks's buttocks; and one exit wound in his abdomen. She stated that one of the bullets was lodged in Brooks's right lumber spine, near the tailbone. She removed the projectile and it was processed by the NOPD crime lab. Dr. Sandomirksy said the other bullet hit "one pretty large artery as well as something called the 'mesentery,' which is a tissue around our bowels." The autopsy report, photographs of the autopsy, and the projectile recovered from Brooks were introduced into evidence.

Dr. Sandomirksy noted that there was "no soot or stippling" on the bullet wounds. She explained when a bullet is fired in close range, the gunpowder can

cause markings on the body. Dr. Sandomirksy testified that the absence of such markings on Brooks suggests that he was two to three feet away from the gun when it was fired.

On cross-examination, Dr. Sandomirky stated that it was "possible, but unlikely" two different weapons were involved in the shooting. She explained on redirect that it "would be tremendously unlucky to have been struck that close by two different weapons in a time that was … congruent with each other."

**Charles Dionne** ("Dionne") of the NOPD and an expert in cell site analysis testified that NOPD uses a software called GeoTime to map phone records, which gives an approximation of where the phone is located via a particular cell phone tower. Dionne stated three reports were submitted to GeoTime for the cell phone numbers of Defendant, Scott, and Brooks. He noted that all three phones were all connected through the same cell phone tower in New Orleans East between 1:00 and 2:00 p.m. on the day of the shooting.

On cross-examination, Dionne testified that the GeoTime reports do not indicate that Brooks and Defendant communicated the day of the incident. On redirect, however, Dionne stated that the cell phone records do not track the phone in real time, but rather note the location of the phones when they made a call. The cell phone records and GeoTime reports were introduced into evidence.[12]

**Kenneth Leary** ("Leary"), a criminologist with NOPD Crime Lab and expert in firearm examination and ballistics analysis, testified that the two 7.62x39 millimeter casings found at the scene belonged to the gun recovered from Jonlee Drive. He stated that the bullet fragments found inside Brooks's body were too

_____

[12] A power point was also used as a demonstrative tool at trial regarding the locations of the phones the day of the murder.

damaged to identify the caliber. Leary testified that he did not receive any nine-millimeter cartridges to test because none had been collected on the scene. The firearm report, authored by Leary, was introduced into evidence.

**Alan Seaton** ("Seaton") of the NOPD Digital Forensic Unit and an expert in digital forensics, testified that the NOPD used cell phone software called Cellebrite to process Scott's phone. He stated that Scott's phone called a certain phone number four times. However, Seaton admitted on cross-examination that the phone had not been used to call nor did it receive a call from a number associated with Brooks. On redirect, Seaton testified that it was possible that the number Scott called belonged to a burner phone. Seaton's forensic report was introduced into evidence.

**Angela Maher** ("Maher") of the State Police Crime Lab and expert in DNA analysis testified that she was provided oral swabs of both Defendant and Scott. She also received a blood sample from Brooks. Maher stated that DNA analysis performed on the swab of the cartridge case "did not detect the presence of amplifiable DNA." She testified it is common that DNA is not recoverable from casings because when a bullet is fired the heat will degrade any DNA present. Maher also stated that DNA was not recovered from the gun grip, the trigger guard, or the trigger. She noted that when she received the DNA, it did not denote a particular firearm, just the areas of the gun that were swabbed. Maher's DNA reports were introduced into evidence. In connection with Maher's testimony, Defendant also offered into evidence Det. Davis's request for DNA analysis, which shows that three swabs (from slide/grip, trigger and trigger guard, and spent casing) from the firearm were submitted for testing.

**Chanterelle Brooks Mitchell**, Brooks's mother, provided testimony about her son and identified a photograph of him.

**DISCUSSSION**

**Error Patent No. 1/Assignment of Error No. 1**

There is a discrepancy between the sentencing transcript and the minute entry regarding sentencing. This error patent is also raised as an assignment of error and requests that we order the trial court to correct the sentencing minute entry and commitment order, if necessary. The State also acknowledges this error and does not oppose Defendant's request for amendment.

The sentencing transcript shows that Defendant was sentenced to life for second degree murder; forty years for obstruction of justice; and twenty years for possession of a firearm by a convicted felon. The minute entry, however, provides that Defendant received a life sentence for all three counts. This Court has held that where "there is a discrepancy between a minute entry and the transcript, the transcript prevails." *State v. Lawrence*, 2012-1026, p. 5 (La. App. 4 Cir. 7/3/13), 120 So.3d 812, 816 (citing *State v. Randall*, 2010-1027, p. 3 (La. App. 4 Cir. 6/22/11), 69 So.3d 683, 685). Nevertheless, in an abundance of caution, and in accordance with the State's acknowledgement of the error, we remand the matter to the trial court to amend the minute entry, dated November 8, 2024, to conform with the sentencing transcript and commitment order, if necessary.[13] *See State v. Budd*, 2023-0594, pp. 19-20 (La. App. 4 Cir. 7/26/24), 398 So.3d 670, 682 (remanding to trial court to amend minute entry where there was a discrepancy between the minute entry and the transcripts, "with the minute entry listing a

_____

[13] The commitment order is not in the record and thus it is unclear what sentence it reflects.

14

conviction of third-degree rape, while the transcripts indicate a conviction of sexual battery"); *State v. Wade,* 2022-260, p. 8 (La. App. 5 Cir. 2/27/23), 358 So.3d 937, 943 (ordering a correction where there was a discrepancy between the transcript, the minute entry, the uniform commitment order, and the multiple offender sentence minute entry).

**Error Patent No. 2**

There is a second error patent regarding the sentencing delay. La. C.Cr.P. art. 873 requires a twenty-four-hour delay between the denial of a motion for new trial and a motion in arrest of judgment unless the defendant expressly waives the delay or pleads guilty.[14] The Fourth Circuit has consistently held that a defendant may implicitly waive the twenty-four-hour delay when the defendant announces his readiness for sentencing. *See State v. Green,* 2010-0791, pp. 20-21 (La. App. 4 Cir. 9/28/11), 84 So.3d 573, 586 (citing *State v. Pierre*, 1999-3156, p. 7 (La. App. 4 Cir. 7/25/01), 792 So.2d 899, 903); *State v. Foster,* 2002-0910, p. 2 (La. App. 4 Cir. 12/11/02), 834 So.2d 1188, 1191. However, the Louisiana Supreme Court in *State v. Kisack*, 2016-0797, p. 7 (La. 10/18/17), 236 So.3d 1201, 1205, noted that "the waivers under the circumstances presented in those decisions are typically not so much implicit as expressly made (by announcing that defendant is ready to be sentenced) without being as fully articulated as they should perhaps have been." The Louisiana Supreme Court held that "[a]n implicit waiver ... runs afoul of the plain language of Art. 873 that requires that the waiver be expressly made." *Id*. The

---

[14] La. C.Cr.P. art. 873 states:

> If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

*Kisack* Court concluded that defense counsel's mere participation in a sentencing hearing was insufficient to constitute an express waiver of the sentencing delay. *Id.*; *see also State v. West*, 2022-0721, p. 20 (La. App. 4 Cir. 7/5/23), 371 So.3d 1, 14 (finding that the defendant's participation in sentencing and advocating for a lighter sentence was insufficient to waive the sentencing delay).

Additionally, this Court has held that the trial court's failure to observe the required twenty-four-hour delay is harmless error where the defendant does not complain of his sentence on appeal. *State v. Berniard*, 2014-0341, p. 9 (La. App. 4 Cir. 3/4/15), 163 So.3d 71, 79, (citing *State v. Celestain*, 2013-1262, p. 10 (La. App. 4 Cir. 7/30/14), 146 So.3d 874, 881; *State v. Duncan*, 2011-0563, p. 8 (La. App. 4 Cir. 5/2/12), 91 So.3d 504, 511).

Here, the minutes fail to reflect that the trial court observed the twenty-four-hour sentencing delay or that Defendant waived the delay. The sentencing transcript, on the other hand, shows that counsel for Defendant expressly waived the sentencing delays on behalf of Defendant after the denial of the motion for new trial and motion for judgment notwithstanding the verdict. [15] Moreover, Defendant does not complain of his sentencing on appeal. As such, any error in the trial court's failure to observe the twenty-four-hour delay before sentencing Defendant is harmless. *See Celestain,* 2013-1262, p. 12, 146 So.3d at 882 (finding the trial court's patent error, in sentencing the defendant less than twenty-four hours after

---

[15] The transcript provides:

> THE COURT: Oh, Mr. Boshea, are you waiving delays?
>
> MR. BOSHEA: Yeah. Let the record reflect I spoke to Mr. Penn. I told him I was waive — asked him if he wished to waive sentencing delays, and he said yes.
>
> THE COURT: All right. So delays are waived. Okay. Perfect. Thank you

denying his motion for new trial, was harmless, where the defendant did not complain of his sentence on appeal and where the defendant waived the delay by acknowledging he is ready for sentencing).

**Assignment of Error No. 2**

As his second assignment of error, Defendant contends that there was insufficient evidence to convict him of second-degree murder.

This Court in *State v. Butler*, 2024-0061, pp. 9-10 (La. App. 4 Cir. 12/30/24), 407 So.3d 744, 749–50, recently outlined the standard for reviewing a claim of insufficiency of evidence as follows:

> [A]n appellate court's standard of review when analyzing a sufficiency of the evidence claim is to "determin[e] whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that all of the elements of the offense had been proven beyond a reasonable doubt." *State v. Groves*, 2020-0450, p. 21 (La. App. 4 Cir. 6/10/21), 323 So.3d 957, 971 (first citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); and then citing *State v. Tate*, 2001-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928). As this Court has further explained, the focus in this *Jackson* standard of review is on the rationality of the fact finder, such that the appellate court should overturn irrational decisions to convict; uphold rational decisions to convict; and impinge on the fact finder's discretion only if and when "necessary to guarantee the fundamental protection of due process of law." *State v. Hunter*, 2022-0742, p. 5 (La. App. 4 Cir. 7/6/23), 371 So.3d 108, 113 (citations omitted). Thus, under this standard of review, an appellate court cannot "substitute its own appreciation of the evidence for that of the fact finder." *State v. Galloway*, 55,591, p. 9 (La. App. 2 Cir. 4/10/24), 384 So.3d 1167, 1174 (first citing *State v. Pigford*, 2005-0477, p. 6 (La. 2/22/06), 922 So.2d 517, 521; and then citing *State v. Steines*, 51,698, p. 7 (La. App. 2 Cir. 11/15/17), 245 So.3d 224, 229). Stated differently, "[u]nder the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 2011-0414 p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771 (quoting *State v. Jones*, 2011-0649, p. 3 (La. App. 4 Cir. 10/19/11), 76 So.3d 608, 611).

Additionally, this Court has held that the testimony of a single witness, if reasonably credible and believed by the trier of fact, is sufficient to support a

conviction. *State v. Wells*, 2010-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306 (citing *State v. White*, 28,095 (La. App. 2 Cir.5/8/96), 674 So.2d 1018); *see also State v. Rickmon*, 2023-0766, pp. 7-8 (La. App. 4 Cir. 2/18/25), 409 So.3d 284, 290. "A victim's or witness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility determinations of the fact finder beyond the constitutional standard of sufficiency." *State v. Johnson,* 2013-0343, p. 7 (La. App. 4 Cir. 10/1/14), 151 So.3d 683, 689 (citing *State v. Davis*, 2002–1043, p. 3 (La. 6/27/03), 848 So.2d 557, 559). "In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the fact finder, is sufficient support for the requisite factual conclusion. *Johnson*, 2013-0343, p. 7, 151 So.3d at 689-690 (citing *State v. Dorsey*, 2010-0216 (La. 9/7/11), 74 So.3d 603, 534; *State v. Robinson*, 2002-1869, p. 16 (La. 4/14/04), 874 So.2d 66, 79).

Second-degree murder is defined, in part, as "the killing of a human being: (1) [w]hen the offender has a specific intent to kill or to inflict great bodily harm;" or (2) "[w]hen the offender is engaged in the perpetration or attempted perpetration of … armed robbery, first degree robbery, second degree robbery, [or] simple robbery … even though he has no intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1)(2).

Defendant first contends that the State failed to prove that he, rather Scott, had shot Brooks. However, viewing the evidence in a light most favorable to the prosecution, a rational juror could have found that Defendant fired the shots that killed the victim.

As noted above, the testimony of one witness absent irreconcilable conflict is sufficient to support a guilty verdict. *Wells*, 2010-1338, p. 5, 64 So.3d at 306;

18

*Rickmon*, 2023-0766, pp. 7-8, 409 So.3d at 290. Scott provided testimony that while he had set up the drug deal, Defendant had brought the guns, robbed, and shot Brooks on June 8, 2022.

Scott testified that he knew Defendant because he was dating his sister, Courtney, with whom he had formerly resided in an apartment at 8002 Trapier Avenue. Scott also testified that Defendant asked him for help procuring some marijuana, so he contacted Brooks, from whom he had previously purchased marijuana. Scott said he and Defendant later met Brooks at the Trapier Avenue apartments. Scott stated that he was on the phone when Defendant went to speak with Brooks. Scott heard a "commotion" shortly thereafter and observed Defendant pointing a rifle at Brooks. Scott also testified that Defendant instructed him to take Brooks's marijuana. He stated that Brooks's cell phone and gun were also taken. Scott testified that as Brooks began to walk away, Defendant shot him twice in the back. Scott and Defendant then fled in Defendant's vehicle and Defendant threw Brooks's cell phone out of the window on the side of the interstate. Scott identified the firearm Defendant used to shoot Brooks at trial.

Moreover, the physical evidence, the surveillance videos, and testimonial evidence corroborate Scott's testimony. The surveillance footage depicted Scott, Defendant, and Defendant's vehicle at Trapier Avenue; their first unsuccessful attempt to purchase marijuana; their return to the apartments to meet Brooks; Brooks on the ground following the shooting; Defendant's vehicle fleeing the scene; and Defendant and Scott's return to the Jonlee residence after the shooting. Also, a search of Defendant's residence yielded two firearms, including the rifle Scott identified as the murder weapon. Also, Det. Davis testified that the rifle used to shoot Brooks was found in the red backpack in the closet in Defendant's

residence. The surveillance footage also showed Defendant in possession of the red backpack the day of the shooting. Moreover, the NOPD crime lab technician, Leary, testified that the shell casings collected from the crime scene had been fired from the gun seized from the red backpack.

Det. Davis also testified that Brooks's cell phone was tracked to I-10 and Crowder Blvd., consistent with Scott's testimony that Defendant had thrown the victim's phone out the window on the side of the interstate. Dr. Sandomirsky's testimony that the victim sustained two gunshot wounds near his buttocks also corroborates Scott's testimony that Defendant shot Brooks in his back.

Further, the jury heard Defendant's recorded police interview, during which he denied leaving his house at any time on June 8, 2022; denied meeting either Scott or Brooks that day; and later alleged that he witnessed unknown assailants shoot the victim, all of which was contradicted by the surveillance footage and the ballistics evidence presented at trial. Moreover, Det. Davis stated that there was no testimonial nor physical evidence suggesting Scott was the shooter.

Based on the foregoing, it appears that the jury decision to accept Scott's trial testimony and reject Defendant's theory of innocence was supported by the evidence presented at trial. As such, there was sufficient evidence to establish Defendant, not Scott, was the individual who had shot Brooks.

Secondly, Defendant argues that the State failed to prove that he possessed the specific intent to either kill or inflict great bodily harm upon the victim.

As stated above, second-degree murder is "the killing of a human being: (1) [w]hen the offender has a specific intent to kill or to inflict great bodily harm;" or (2) "[w]hen the offender is engaged in the perpetration or attempted perpetration of … armed robbery, first degree robbery, second degree robbery, [or] simple robbery

20

… even though he has no intent to kill or to inflict great bodily harm." La. R.S. 14:30.1(A)(1)(2).

"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." *State v. Duncan,* 2024-0664, p. 20, --- So.3d ----, ----, 2025 WL 3706658 at *10 (La. App. 4 Cir. 12/22/25) (citing La. R.S. 14:10(1)). "Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances." *Duncan*, 2024-0664, p. 20-21, 2025 WL 3706658 at *10 (quoting *State v. Hollins*, 2023-0785, p. 4 (La. App. 1 Cir. 3/19/24), 387 So.3d 641, 646 and citing *State v. Meek*, 2023-0362, p. 4 (La. App. 1 Cir. 11/9/23), 379 So.3d 67, 71-72).

Here, there was testimony that Defendant pointed a firearm at Brooks and fired two shots at his lower back as he walked away. A rational jury could conclude that Defendant possessed the specific intent to kill or inflict bodily harm when he fired a gun at Brooks. Additionally, Scott testified that Defendant, while armed, instructed him to take Brooks's marijuana. There was also testimony that Brooks's cell phone and firearm were taken at gun point. The jury could likewise find that Defendant was engaged in the commission of an armed robbery at the time of the shooting. *See* La. R.S. 14:64 (A) ("[a]rmed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon"). Accordingly, we find sufficient evidence was presented to justify Defendant's conviction for second degree murder. This assignment of error lacks merit.

**DECREE**

For the foregoing reasons, we affirm Defendant's conviction and sentence for second degree murder. We also remand the matter to the trial court with instructions to amend the November 8, 2024 minute entry, to conform with the sentencing transcript as well as the commitment order, if necessary.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS**